UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

_____

| | | |
|---|---|---|
| **Bartz, et al.,** | ) | |
| | ) | No. 3:24-CV-05417-WHA |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | San Francisco, California |
| **Anthropic PBC,** | ) | October 10, 2024 |
| | ) | 11:33 a.m. |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE WILLIAM H. ALSUP, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

INITIAL CASE MANAGEMENT CONFERENCE

Official Court Reporter:
**Cathy J. Taylor, RMR, CRR, CRC (By Zoom Videoconference)**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2    For the Plaintiffs:
          SUSMAN GODFREY, LLP
3         By:   **Justin A. Nelson, Esq.**
          1000 Louisiana Street, Suite 5100
4         Houston, Texas  77002

5         SUSMAN GODFREY, LLP
          By:   **Rohit Dwarka Nath, Esq.**
6         1900 Avenue of the Stars, Suite 1400
          Los Angeles, California  90067
7
          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
8         By:   **Reilly Todd Stoler, Esq.**
          275 Battery Street, 29th Floor
9         San Francisco, California  94111-3339

10        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
          By:   **Rachel Geman, Esq.**
11        250 Hudson Street, 8th Floor
          New York, New York  10013-1413
12
     For the Defendant:
13        ARNOLD & PORTER KAYE SCHOLER, LLP
          By:   **Douglas Andrew Winthrop, Esq.**
14              **Estayvaine Bragg, Esq.**
                **Jessica Lim Gillotte, Esq.**
15        Three Embarcadero Center, 10th Floor
          San Francisco, California  94111-4024
16
          LATHAM & WATKINS
17        By:   **Joseph Richard Wetzel, Esq.**
          505 Montgomery Street, Suite 2000
18        San Francisco, California  94111

19

20

21

22

23

24

25

1       **P R O C E E D I N G S**

2           THE COURTROOM DEPUTY:  Calling Civil Action 24-5417,

3   Bartz, et al., vs. Anthropic PBC.

4           Counsel, please approach the podium.  State your

5   appearances for the record beginning with counsel for

6   plaintiffs.

7           MR. NELSON:  Good morning, Your Honor.  Justin Nelson

8   from Susman Godfrey representing the Bartz plaintiffs.  With me

9   from Susman Godfrey is Rohit Nath.  With me from Lieff Cabraser

10  is Rachel Geman and Reilly Stoler.

11          THE COURT:  Welcome to all of you.

12          And?

13          MR. WINTHROP:  Good morning, Your Honor.  Doug

14  Winthrop from Arnold & Porter on behalf of Anthropic.  I'm here

15  with my colleagues, Estayvaine Bragg and Jessica Gillotte.  And

16  then my co-counsel here, Joe Wetzel, from Latham & Watkins.

17          THE COURT:  All right.  Welcome to all of you.

18          All right.  We're here for a case management

19  conference.  I want -- I've read most of the complaint, but I

20  want to give you a chance to tell me in two minutes, that's it,

21  to summarize your case.

22          And then you'll get two minutes to summarize your

23  case.

24          Go ahead.

25          MR. NELSON:  Thank you, Your Honor.

1           This case involves the unauthorized use of hundreds of
2    thousands of copyrighted books that Anthropic is alleged to
3    have taken without permission in something called The Pile.
4    The Pile is a publicly available source that includes within it
5    something called Books3.  Books3 is a pirated database of
6    books.  The allegations are that Anthropic took that pirated
7    data source and used it to train its large language model and
8    specifically, because books are incredibly important to train
9    that large language model, it knew that it was a pirated
10   dataset, and it, nevertheless, did it.

11          The defense that we think is coming is fair use.  We
12   do not think that it is a proper case for fair use.  The very
13   kernel of what these books are about is expressive content.
14   How you say something is incredibly important.  That is exactly
15   what Anthropic does in training.

16          So this is not something, say, like the *Sega* case,
17   where the intermediate copying was for the non-expressive
18   content.  This is directly for the expressive content.  And in
19   many ways this is no different from something like *Napster*,
20   where, for example, a teenager cannot download something from
21   the Internet and listen to music without infringing the
22   copyright.

23          Certainly a corporation cannot download a pirated --
24   known pirated website to its own database and then use it for a
25   commercial purpose.

1          Thank you, Your Honor.

2          THE COURT:  A very good, short summary.  You get an

3    A plus.  I don't have to agree with everything, but you did

4    what I asked.  In two minutes or less, you summarized the case.

5          Okay.  Mr. Winthrop, you get two minutes.

6          MR. WINTHROP:  All right.  And the bar has been set

7    high, so I will --

8          THE COURT:  Be good.

9          MR. WINTHROP:  Anthropic is an AI research company.

10   Its core product is Claude, which is a family of large language

11   models.  And that's a text-based type of generative AI system

12   that uses deep learning techniques and large data sets to

13   understand, summarize, generate, and predict new content.

14         Anthropic's Claude models performed tasks -- tasks

15   involving language, reasoning, analysis, and coding, among

16   other things.  Its users are individuals seeking help with

17   drafting an email, all the way to businesses looking to enhance

18   their internal functions, create complex financial forecasts,

19   that sort of thing.

20         The plaintiffs here, as counsel said, are three

21   authors that they say -- they're asserting a single claim of

22   copyright infringement.  A number of the AI copyright cases in

23   the Northern District have many, many claims.  This has one

24   claim, a single claim of direct copyright infringement.  And

25   the claim is based solely on the theory that Anthropic's

1  intermediate use of copyrighted works to teach its generative

2  AI models statistical patterns about how humans use language

3  constitutes copyright infringement.

4       Critically, this is super important when you think

5  about the other AQ -- AI cases around the Northern District and

6  the country.  There is no claim in this case that any output

7  ever generated by any Anthropic AI model is substantially

8  similar to any of the copyrighted works.

9       So this is a classic fair use, a transformation -- a

10 transformative use of taking data, using it to train these

11 machines, to teach it about language, and then something new is

12 created from that.

13      There are procedural issues in this case in terms of

14 whether they have adequately alleged that, in fact, their

15 clients' books were, in fact, in this dataset.

16      THE COURT:  Well, they do allege it.

17      MR. WINTHROP:  What's that?

18      THE COURT:  They do.  They certainly allege that they

19 are.

20      MR. WINTHROP:  They don't -- we would submit, Your

21 Honor, they don't allege it in any kind of way that's factual.

22 And they do --

23      THE COURT:  Why don't you just tell us.  Were they or

24 not?

25      MR. WINTHROP:  The -- I don't know the answer to that.

1          THE COURT:  Well, take a deposition tomorrow.

2          MR. WINTHROP:  Yeah, I understand.

3          THE COURT:  Let's find out.  I'm going to authorize

4     that.

5          MR. WINTHROP:  Thank you, Your Honor.

6          THE COURT:  And this is ridiculous for you to hide

7     behind that.  Either these books were read and part -- in part

8     of your program or they weren't.  And for you to say they got

9     to allege it when it's all within the -- your -- your company's

10    records, I don't stand for that.

11         MR. WINTHROP:  Yeah.  What I was -- just to be clear,

12    what my argument is, Your Honor, is they're alleging the books

13    were in a data set, and then they're saying that dataset was

14    used.

15         Our only point is the dataset is outside, and there --

16    what we're saying is there's no clear allegation that they were

17    in that dataset that they have access to.  That's -- to be very

18    clear, that's my point.

19         THE COURT:  And is that true, that you don't allege

20    that?

21         MR. NELSON:  We absolutely allege it, Your Honor.  We

22    allege it, for example, when we talk about the various

23    plaintiffs.

24         THE COURT:  I read that -- I read that this morning,

25    And it seemed to me you said that all three plaintiffs, their

1    books were in what's it called Book3.

2         MR. NELSON:  Books3, Your Honor.  It's paragraphs 56

3    through 58 of the complaint.

4         THE COURT:  And -- and so if that's -- why isn't that

5    good enough?

6         MR. WINTHROP:  The way -- Your Honor, the way it is

7    phrased, and I'll go to it, is this.  If you look at 56, they

8    say, "Plaintiff Bartz is the author of a number of books,"

9    blah, blah, blah.  "This novel was included in the Books3

10   dataset, based on public reporting about the dataset.  Pirated

11   copies of her work are available online through websites like

12   LibGen and Bibliotek.  Bartz is the author and owner of the

13   registered copyrights works."

14        So they're citing websites like LibGen and Bibliotek.

15   They don't -- what our problem is, Your Honor, is that they

16   don't clearly state, like, they've done their work and they

17   have concluded that these books are in Books3.

18        It's a very simple, straightforward argument.  If

19   it's -- if they're in there, fine, we move on that -- from

20   that.  But that's the critical thing, that the complaint is

21   worded in a very odd way.

22        THE COURT:  But why can't they rely upon public

23   reporting?

24        MR. WINTHROP:  With what public reporting?  Can't

25   they -- shouldn't they say what public reporting?  I don't

1     mean -- I don't mean this to be like --

2            THE COURT:  Answer that.  Help me out here.  What

3     public reporting?

4            MR. NELSON:  The Atlantic Magazine.  The Atlantic

5     Magazine has created basically a facsimile of the Books3

6     database.  Prior to alleging these particular books, we ran

7     them through the facsimile of the Books3 database, and all of

8     them were in it.  So that is exactly why.  We do not have the

9     Books3 -- that's we were careful with what we said, which is

10    the Books3 is Books3, which has its own set of issues, which is

11    a pirated website, Your Honor.

12           So instead of going to a pirated website, we went to

13    the facsimile of the website, which is the Atlantic database,

14    ran those names through, and saw that they all hit upon it.

15    And not just that, the LibGen and Bibliotek references are

16    there to show that it is reasonable to expect, certainly way

17    more than plausible to expect that these are in the Books3

18    database given that they are also in other pirated websites.

19           THE COURT:  Well, wait.  I didn't understand the last

20    point.  When -- you called something Atlantic.

21           MR. NELSON:  The Atlantic Magazine, Your Honor.

22           THE COURT:  All right.  So you went to Atlantic

23    Magazine, and all three of the novels were in the list.

24           MR. NELSON:  Thank you, Your Honor.  Yes.

25           THE COURT:  Is that true?

1          MR. NELSON:  Correct.

2          THE COURT:  All right.  So why is that not good

3    enough?

4          MR. WINTHROP:  Because that is not in the complaint,

5    and we talked this morning.  And if I -- they saw from the

6    statement one concern we have, and they told me they were going

7    to try to tell me and show me that, in fact, they have this

8    evidence.

9          I am skeptical, Your Honor, but I'm open-minded.  I

10   don't want to file a motion.

11         THE COURT:  Please don't file one when it's that easy.

12         I want you by the end of the week, show him the

13   Atlantic list.  Highlight the names of the three.

14         MR. NELSON:  Absolutely, Your Honor.

15         THE COURT:  All right.  Okay.  Now, do you deny that

16   your company uses Books3?

17         MR. WINTHROP:  I don't know at this point that the --

18   the full use of the training, but that's -- so that would be a

19   question --

20         THE COURT:  That's what's alleged.

21         MR. WINTHROP:  Yes --

22         THE COURT:  So --

23         MR. WINTHROP:  -- I understand.

24         THE COURT:  -- why don't you go take the deposition

25   tomorrow of a 30(b)(6) person to find out if they're using

1     Books3.

2               This ought to be -- the facts here should not be in

3     dispute.  If it's truly fair use, you should be open about

4     everything that happened --

5               MR. WINTHROP:  Yeah.

6               THE COURT:  -- and -- and so that they -- we -- okay.

7               Now, what is your answer to his point?  His point is,

8     we're not selling pirated copies.  We're not going out -- and

9     what's the name of this book?  The Last -- the Lost Night, a

10    novel.

11              They're not going out and selling bootleg copies of

12    this novel.  Kind of the classic misuse of copyright.

13              What they're doing is, he says, a transformative use,

14    the words in that novel and, as you say, the expression to

15    train their -- what's it called?

16              MR. WINTHROP:  It'll a model.  Claude.

17              THE COURT:  Claude, yes.

18              So that -- I can see the argument.  I'm not saying I

19    agree with it.  I don't know yet.  But tell me, preview what

20    your response to that's going to be.

21              MR. NELSON:  Sure.  And we'll put aside the output

22    case, whether it actually is transformative.  But just this is

23    an input case.  The -- the copying of a pirated book is a

24    copyright violation.  And the American -- the *A&M Records vs.*

25    *Napster*, 239 F.3d 1004 at 1015, Ninth Circuit, I'm going to

1    quote.  "Downloading a file" -- in that case it's downloading

2    an MP3 -- "does not transform a work," period.

3            I would also point Your Honor to the *Texaco* case from

4    the Second Circuit, which the *Napster* case from the Ninth

5    Circuit has cited with approval, which is 60 F.3d 913 and from

6    1994 written by Judge Newman.  There was a dissent by

7    Judge Jacobs on it, but that also talks about the intermediate

8    copying for expressive purposes is a copyright violation.

9            And so when the fact that -- for example, even

10   assuming that they are correct that it is transformative on the

11   output side, which we would dispute, but the fact that they are

12   making a copy for their own purposes without permission is not

13   fair use.  They do not have permission from that -- to do that.

14   And otherwise that is, again, just to use my analogy from the

15   initial two minutes, it is very much like the *Napster* case,

16   when someone --

17           THE COURT:  Well, I see what you're saying.  Again,

18   I'm not saying I agree with it or disagree.  But let's say

19   that a book editor of the New York Times uses a bootlegged

20   copy, reads it, and does a book review.  That's the classic

21   fair use.

22           Why do they even need a license to do that?

23           MR. NELSON:  The bootleg copy itself -- we're not

24   talking about the output side of that.  But is the editor of

25   the New York Times or the reader himself or herself liable for

1   downloading a piloted book from the website?  Absolutely.

2              THE COURT:  That's interesting.

3              MR. NELSON:  Yeah.

4              THE COURT:  I didn't know that.  Give me -- give me a

5   case that says that.

6              MR. NELSON:  Well, it is -- that's the whole line of

7   *Napster* cases.  It's the context of music.

8              And I don't -- you know, I'm happy to be corrected if

9   I'm wrong by Mr. Winthrop, but if there is a download of a

10  pirated book, okay, that download of the book and your use of

11  that is a copyright violation.

12             MR. WINTHROP:  To --

13             THE COURT:  All right.  Go ahead.  And then --

14             MR. WINTHROP:  Two -- two things:  *Napster* was song is

15  inputted; song is listened to by the kid down the block, right,

16  who didn't pay for it.  That's *Napster*.

17             What -- what counsel is arguing for essentially would

18  nullify the fair use defense to say that, oh, whenever the

19  person's engaging in fair use, makes an intermediate copy,

20  that's in and of itself a copyright infringement even though

21  the use that is put -- put to it is a -- the classic fair use.

22             So I don't think that is right.  The cases he's -- I

23  will go back and look.  The cases he's citing are all that --

24  he just said the *Napster* cases.  *Napster* is -- there's no

25  transformative use in *Napster*; right?  It's a song is copied

1    and a song is played.

2         THE COURT:  In the *Oracle* case, which was my case, and

3    the Supreme Court ultimately ruled in there there was exact

4    copying.  Exact copying.  And the Supreme Court said that was

5    fair use.

6         MR. NELSON:  Absolutely, Your Honor.  And, in fact --

7    and I just reread that decision, and it was one of the last

8    decisions written by Justice Breyer.  And it specifically

9    discusses how software is different from things like books

10   because it is a lower standard and talks about how there's less

11   expressive content.

12        THE COURT:  That's true.  That's a good point.

13        MR. NELSON:  And so -- and, again, we are -- look,

14   there -- there's -- we are not -- we embrace the case law of --

15   of things like the -- you know, *Sega* and -- and cases like

16   that, because we think in those cases those are all about the

17   non-expressive content.  That part of it is to make it

18   harmonize, for example, so that the non-*Sega* user or the

19   non-*Sega* company can make it compatible with.  That is not for

20   the expressive idea of it.

21        Here there is -- there is no case law.  And it would

22   radically transform copyright to say that you can download

23   something, you can use something without permission and use it

24   for its expressive content and not have to pay for that.

25        That's just -- that's not where we're headed, I don't

UNITED STATES DISTRICT COURT

1    think.  I think it would be a radical and -- and really

2    disruptive change to the copyright holders and to intellectual

3    property in this country should it go down that route.

4          And, look, there's no doubt this is an important case.

5    And -- and Mr. Winthrop and my learned colleagues on the other

6    side and we are going to get along fine in terms of the

7    lawyers.  But there are fundamental disputes in this case about

8    where we're headed with these issues.  And what are the rights

9    of intellectual property holders who basically Anthropic has

10   strip mined the intellectual property, used it.  And, again, I

11   don't think we're going to find -- I think we're going to find

12   out that they used Books3.  Used it to train their database.

13         And the answer is that, no, no, no, we didn't use

14   Books3, or something similar, but that we have the absolute

15   right to do it for our own commercial purposes because we want

16   to know exactly how a word is strung together.  A word is

17   strung together or a sentence is strung together; right?  How

18   the word is used; that is, the number and the vectors that go

19   into it, as we described in the complaint about how these large

20   language models work.

21         THE COURT:  Okay.  Time to give you a schedule.

22         All right.  Have you done your initial disclosures?

23         MR. NELSON:  They are -- we have proposed, Your Honor,

24   October 25th, which is two weeks and a day.  I think their

25   proposal is November 8th.

```
 1              MR. WINTHROP:  November 8th.  There was a -- all --
 2    all parties -- you may have seen this from the report, Your
 3    Honor.  All parties were confused by the two scheduling orders,
 4    and so --
 5              THE COURT:  October 25.
 6              MR. WINTHROP:  -- we --
 7              THE COURT:  Leave to add any new parties or pleading
 8    amendments.  I'm going to give -- I don't think there will be
 9    any, so I'm going to give you until December 4.
10              All right.  ADR.  What's your plan for ADR?
11              MR. NELSON:  Well, Your Honor, given Your Honor's
12    order on class actions --
13              THE COURT:  That's right.  You -- you're not supposed
14    to.  All right.  No talking of settlement until we make sure
15    there's a class.  Then it's your duty to talk settlement --
16              MR. NELSON:  Correct, Your Honor.
17              THE COURT:  -- but not yet.
18              All right.  Fact discovery cutoff.
19              MR. NELSON:  I think we are actually in agreement on
20    fact discovery cutoff for December 4th, 2025, Your Honor.
21              THE COURT:  No way.  That's too far.
22              MR. NELSON:  Okay.  The -- the re- -- can I just say
23    with.
24              THE COURT:  I'll give you till August 29 next year.
25              MR. NELSON:  Okay.  Thank you, Your Honor.
```

1          THE COURT:  And that will also be the date your expert

2   report is due if you have the burden of proof on the issue.

3          MR. NELSON:  Thank you, Your Honor.

4          THE COURT:  I don't think the facts are going to be

5   that disputed.  I think it's --

6          MR. NELSON:  Your Honor, there -- from -- from prior

7   experience in others of these cases -- and -- and the

8   plaintiffs, for example, represent book authors -- other book

9   authors against OpenAI and Microsoft.  And I know the

10  defendants also have some familiarity with these cases as well.

11  There will be, I would say -- even assuming the sort of

12  macro-agreement on facts, there are a number of issues that

13  require looking into the training databases, going and -- and

14  so it -- it will be factual intensive.

15         THE COURT:  I'm going to stick with my date.  All

16  right.  You're -- you're -- you raise a good point, but my date

17  for now.

18         Final pretrial conference -- sorry -- summary judgment

19  deadline, October 1.

20         Final pretrial conference will be November 19th.

21         MR. NELSON:  And I'm sorry to interrupt, Your Honor.

22  Class certification --

23         THE COURT:  I'm going to come to that.

24         MR. NELSON:  Okay.  Thank you, Your Honor.

25         THE COURT:  And then the trial will be December 1.

```
 1    Jury trial.
 2              Now, the motion for class certification must be filed
 3    by March 6th, to be heard on a 49-day track.
 4              Do you know what I mean by that?
 5              MR. NELSON:  Yes, Your Honor.
 6              THE COURT:  Each side gets an extra week.
 7              All right.  So that will give you time to take class
 8    discovery if anybody wants to.
 9              I have a question for you.  Will it have -- be of help
10    or a hindrance to do a --
11              THE COURT REPORTER:  I'm sorry?  To do a what?
12              THE COURT:  -- tutorial, T-U-T-O-R-I-A-L, for the
13    benefit of the judge and his law clerk on this whole problem?
14              MR. NELSON:  Your Honor, I -- I would defer, but I --
15    we are at the Court's pleasure on that and are happy to do a
16    tutorial.  I do think that the issues do not require one, but I
17    also think that to the extent -- I mean, in many ways I think
18    we have described the facts as they are and -- and --
19              THE COURT:  Well, I -- you probably have, but it might
20    help me to understand the facts.  I -- I understand a
21    reasonable amount about code.  I don't understand training in
22    article intelligence, so I would like to have some -- I ask the
23    question, is it possible to give the Judge a 90-minute
24    tutorial?  Both sides get equal time.  You could do it through
25    the lawyers.  You could do it through -- it won't be evidence.
```

1    It cannot be used -- it cannot be used in the case later to

2    say, oh, he told you that at -- no.  It would just be kind of

3    off the record.  It won't be off the record.  It will be on the

4    record, but it'll be to educate me and the public about the

5    issues in the case and in some of the details --

6                MR. NELSON:  Yeah.

7                THE COURT:  -- of how AI works and how AI gets

8    trained.

9                So that was -- so say each side gets 45 minutes?

10               MR. WINTHROP:  Okay.  We can -- we will --

11               MR. NELSON:  That's --

12               MR. WINTHROP:  I will confer with the client.  But I'm

13   sure if the Judge, you would like that, we'll make sure it gets

14   done.

15               THE COURT:  I would like to do it, but I'd like you

16   two to confer and make a suggestion as to when -- when would be

17   the best time to do such a thing.  I would suggest this year,

18   but it wouldn't necessarily -- it could be early next year.

19               MR. WINTHROP:  Can I raise one issue, Your Honor?

20               THE COURT:  Sure.

21               MR. WINTHROP:  So in the other -- there are several of

22   these cases around the country.  The issue of when summary

23   judgment is heard, whether it's heard before or after class

24   certification, has been an issue in all of these cases.  And

25   the courts have come to different conclusions.  Some have done

1    it the way yours is, with the summary judgment first.  Others

2    have deferred it.  Others have left it flexible.

3              From our --

4              THE COURT:  No, no.  Mine -- mine, the motion for

5    class certification has to be brought before the deadline for

6    summary judgment.  But that doesn't preclude you -- let's say

7    you were to discover in three weeks that the books that are in

8    here are not -- have never been used --

9              MR. WINTHROP:  Right.

10             THE COURT:  -- by your company.  You would bring a

11   summary judgment motion against that plaintiff tomorrow --

12             MR. WINTHROP:  Yeah.

13             THE COURT:  -- and that's okay -- without prejudice to

14   some other motion later on.

15             MR. WINTHROP:  What I -- fair enough.  Thank you for

16   that.

17             What I'm referring to is, for example, in the Second

18   Circuit case, this is -- goes back to the Google Books case --

19   there was a situation where the judge granted class

20   certification.  It went up on appeal.  The Second Circuit

21   vacated the order of class certification and said:  I think

22   it'd be better if you go back and did the fair use issues

23   first.

24             And on the fair -- on consideration on -- on remand of

25   fair use, the district court found there was fair use, and that

1   mooted the class issues.

2           And so I -- I just wanted to raise that with you

3   because it may be -- and I -- this is -- I want to leave it

4   open.  It may be that it would be better, and we'd want to

5   raise with you first fair use before getting into all the

6   complexities of class certification.

7           THE COURT:  Well, I'm not going to rule on that now,

8   but I -- I don't think I know enough to say anything more

9   than -- okay.  Let's take that example.  Let's -- let's say

10  that you could show that for all three plaintiffs they --

11  the -- their books were used in a way that you think was fair

12  use.

13          MR. WINTHROP:  Right.

14          THE COURT:  You bring that motion saying this was fair

15  use as to these three plaintiffs.  And there's no point in

16  burdening the rest of the class with an adverse ruling, so why

17  don't we just rule on these three plaintiffs?

18          That might -- that might actually moot it out.  Maybe

19  not.  Maybe they could get a better plaintiff.  Maybe the next

20  plaintiff, the fourth plaintiff --

21          MR. WINTHROP:  Yeah.

22          THE COURT:  -- would have a better case.  I don't

23  know.

24          But I wouldn't rule that out.  I wouldn't say you have

25  to do it.  I would just say the problem is going to be -- on

1    class certification a problem will be, is the issue of fair use

2    amenable to classwide proof?

3              Maybe.  If all of these books are used in the same

4    way, yes.  If it -- but if they're not used in the same way and

5    it varies from class member to class member, then there's a

6    problem.  And there has to be a classwide method of proof, and

7    that would include the issue of fair use.

8              I don't know.  You don't -- I don't know if you even

9    know enough yet to say which is the best way to do it.  But

10   I'm -- I'm not -- I don't want to tie my hands and say one way

11   is better than the other at this point.  I would just leave it

12   open.

13             MR. WINTHROP:  Well, the -- I -- that's exactly what I

14   was requesting, the -- the one way the courts have done it, and

15   it is to -- and we agreed both sides something like this:  That

16   we would -- we actually were agreeing -- in agreement on the

17   fact discovery cutoff.  You moved it up, but we'll live with

18   that.  But the thought was to leave that fixed, get the fact

19   discovery done, and then discuss that very issue you just

20   raised.  Does it make more sense to do a summary judgment

21   motion?  Does it make more sense to do a class motion?

22             We still can do that, but our thought was to leave it

23   a little more open than the schedule that you have set.  I

24   guess that's my point.

25             THE COURT:  When you say your -- are you referring to

```
 1   both sides, or are you just referring to your side --
 2            MR. WINTHROP:  Well --
 3            THE COURT:  -- when you say "our thought"?
 4            MR. WINTHROP:  No.  I think -- well, I'll let counsel
 5   speak for himself.  I think we discussed this morning the idea
 6   of we've agreed on the fact discovery cutoff and that it may be
 7   a good idea to defer this issue of what goes first, summary
 8   judgment or certain -- class certification, until we know more
 9   about the case.  Just what you said, until we have more.
10            You know, and we could -- we could defer it until the
11   close of fact discovery, or we could even just defer it until
12   we get into fact discovery.
13            THE COURT:  I have --
14            MR. WINTHROP:  But I want it to be --
15            THE COURT:  I have a --
16            MR. WINTHROP:  -- flexible.
17            THE COURT:  Okay.
18            MR. WINTHROP:  Gotcha.
19            THE COURT:  I have a way to deal with this.  I've
20   given you a deadline, March 6th, to file for class
21   certification.  As we get closer to that, if both sides were to
22   agree that, wait, we like your approach to not to do class
23   certification until after summary judgment -- that's
24   ridiculous, really.  That's one-way intervention.  I don't
25   know.  But -- but you could then both stipulate and give me a
```

1    motion.

2           Now, I might -- I probably -- I won't say I would

3    automatically go along with it, but I -- but -- but right now I

4    want to have a date, a deadline date.

5           MR. WINTHROP:  And so --

6           THE COURT:  And as we get closer, if you think you

7    both agree this -- that this is premature, you could probably

8    talk me out of the deadline.

9           MR. WINTHROP:  All right.  And I trust that if the

10   feeling of good spirit we had this morning in terms of

11   agreement somehow dissipates in the case and we can't agree, I

12   assume we still can come to you and attempt to persuade you

13   on --

14          THE COURT:  Yes, you could.

15          MR. WINTHROP:  -- on the --

16          THE COURT:  Yeah.

17          MR. WINTHROP:  Yeah.

18          THE COURT:  You could always do that.

19          MR. WINTHROP:  Yeah, I thought.

20          THE COURT:  Because everyone knows that I'm

21   Mr. Reasonable.

22          MR. WINTHROP:  That's why I said it.  Yep.

23          MR. NELSON:  Your Honor, we do actually -- we take you

24   seriously on taking a quick deposition on -- on some of these

25   issues.  We do think --

1          THE COURT:  And I'm serious, too.

2          MR. NELSON:  Oh, absolutely.

3          I do think that it would be more efficient if this

4   week or early next week we are able to issue requests for

5   admission and interrogatories --

6          THE COURT:  Yeah.

7          MR. NELSON:  -- on these issues.

8          Thank you.

9          THE COURT:  Oh, yeah.  This -- the purpose of this

10  discovery thing, it's open.  Today under the rule, discovery is

11  wide open.  No stonewalling.

12         And you could take the -- it's wide open.  You could

13  take the plaintiff's depositions.

14         MR. WINTHROP:  Oh, yeah.

15         THE COURT:  Find out if they really wrote these books.

16         MR. WINTHROP:  Let -- let me just be clear.  The point

17  I was making was, is the -- are there books in Books3?

18         If that's easily demonstrated to us by what they're

19  saying, we don't -- that was the only point.  We want to -- we

20  want to get to the heart of this, too, Your Honor.

21         THE COURT:  Well, it could be if you took their

22  depositions somehow they've given away the copyrights.

23         MR. WINTHROP:  That -- there may be some issues there,

24  too, Your Honor.

25         THE COURT:  I'm telling you --

1           MR. WINTHROP:  Yeah.

2           THE COURT:  -- half the class actions I've always

3    done, there's always a problem with the plaintiffs that the

4    lawyers have failed to --

5           MR. WINTHROP:  Yeah.

6           THE COURT:  -- discover.

7           Now, maybe your firms are so great.  But I'm telling

8    you they range from convicted felon -- convicted felon.

9    There's no way a convicted felon is going to represent -- have

10   a fiduciary duty unless the whole class is one of convicted

11   felons so --

12          MR. WINTHROP:  You just -- just took away one of my

13   motions.

14          THE COURT:  All right.

15          MR. WINTHROP:  But that's okay, Your Honor.

16          THE COURT:  So there.  You might want to take their

17   deposition.

18          All right.  How much more damage can I do this

19   morning?

20          I'm going to get out an order --

21          MR. WINTHROP:  Thank you.

22          THE COURT:  -- that captures this.

23          And you owe me a suggested -- I want you to talk about

24   the tutorial.  And if you agree, I would like to do it, but I'm

25   not ordering it yet.  But if you both say, we could do this on

1    January 10th, then I'd probably go along with that.

2            MR. NELSON:  Thank you, Your Honor.  And we will

3    confer on that.

4            And I do -- we have talked a lot about Books3.  To be

5    clear, our allegation is that they are in the training data for

6    Anthropic.  Books3 is the most glaring example of that.  But I

7    think, for example, to get around the issue of -- of saying

8    that they do not use it, it would be -- they are not used at

9    the training data whatsoever, it's something that we'll explore

10   during discovery.

11           THE COURT:  You should do a request to admit that

12   said:  Admit that you used the Last Night -- Lost Night, a

13   novel, as part of the training.

14           MR. NELSON:  Thank you, Your Honor.  That's exactly

15   what --

16           THE COURT:  And if they don't admit or deny something

17   that simple, there will be -- you'll be in trouble with the

18   poor judge.

19           That's something you can admit or deny easily.  You

20   probably know it right now.  Okay.

21           MR. NELSON:  Thank you, Your Honor.

22           THE COURT:  All right.  Good luck to both sides.

23           MR. NELSON:  Thank you.

24           MR. WINTHROP:  Thank you.

25           THE COURTROOM DEPUTY:  Court is adjourned.

1        (Proceedings conclude at 12:07 p.m.)

2                          ---oOo--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    **C E R T I F I C A T E**

5

6          I, CATHY J. TAYLOR, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter.

8          I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control.

13         DATED this 10th day of October, 2024.

14

15

16

17         */s/Cathy J. Taylor*
                                    _____
18                                  Cathy J. Taylor, RMR, CRR, CRC

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT