Pages 1 - 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

ANDREA BARTZ, et al.,            )
                                 )
          Plaintiffs,            )
                                 )
    VS.                          )      NO. 24-CV-05417-WHA
                                 )
ANTHROPIC PBC,                   )
                                 )
          Defendant.             )
_____)

San Francisco, California
Monday, September 8, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                    SUSMAN GODFREY LLP
                    1000 Louisiana Street, Suite 5100
                    Houston, TX 77002
              BY:   **JUSTIN A. NELSON, ATTORNEY AT LAW**

                    SUSMAN GODFREY LLP
                    1900 Avenue of the Stars, Suite 1400
                    Los Angeles, CA 90067
              BY:   **ROHIT D. NATH, ATTORNEY AT LAW**
                    **MICHAEL B. ADAMSON, ATTORNEY AT LAW**

                    SUSMAN GODFREY LLP
                    One Manhattan West, 50th Floor
                    New York, NY 10001
              BY:   **SAMIR DOSHI, ATTORNEY AT LAW**
                    **JAMES CRAIG SMYSER, ATTORNEY AT LAW**

          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                       Official United States Reporter

<u>APPEARANCES</u>: (Continued)

> LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
> 250 Hudson Street, 8th Floor
> New York, NY 10013-1413
> BY: **RACHEL GEMAN, ATTORNEY AT LAW**
> **DANNA Z. ELMASRY, ATTORNEY AT LAW**
> **JACOB S. MILLER, ATTORNEY AT LAW**
>
> LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
> Embarcadero Center West
> 275 Battery Street, 29th Floor
> San Francisco, CA 94111-3339
> BY: **DANIEL M. HUTCHINSON, ATTORNEY AT LAW**
> **ELIZABETH J. CABRASER, ATTORNEY AT LAW**
> **JALLÉ H. DAFA, ATTORNEY AT LAW**
>
> EDELSON PC
> 350 North LaSalle, 14th Floor
> Chicago, IL 60654
> BY: **J. ELI WADE-SCOTT, ATTORNEY AT LAW**
>
> OPPENHEIM + ZEBRAK LLP
> 4530 Wisconsin Avenue, NW, 5th Floor
> Washington, DC 20016
> BY: **MATTHEW J. OPPENHEIM, ATTORNEY AT LAW**
> **JEFFREY M. GOULD, ATTORNEY AT LAW**
>
> NYU SCHOOL OF LAW
> 40 Washington Square South, Suite 411J
> New York, NY 10012
> BY: **SAMUEL ISSACHAROFF, ATTORNEY AT LAW**
>
> COWAN DEBAETS ABRAHAMS AND SHEPPARD LLP
> 60 Broad Street, 30th Floor
> New York, NY 10010
> BY: **NANCY E. WOLFF, ATTORNEY AT LAW**
>
> FAIRMARK PARTNERS
> 400 7th Street, NW, Suite 304
> Washington, DC 20004
> BY: **YINKA E. ONAYEMI, ATTORNEY AT LAW**

<u>APPEARANCES:</u> (Continued)

For Defendant:
                        MORRISON & FOERSTER LLP
                        425 Market Street
                        San Francisco, CA 94105
                BY:   **DARALYN J. DURIE, ATTORNEY AT LAW**

                        ARNOLD & PORTER KAYE SCHOLER LLP
                        Three Embarcadero Center 10th Floor
                        San Francisco, CA 94111-4024
                BY:   **DOUGLAS A. WINTHROP, ATTORNEY AT LAW**
                        **JOSEPH R. FARRIS, ATTORNEY AT LAW**

Also Present:         Maria Pallante
                       Mary Rasenberger
                       Andrea Bartz
                       Charles Graeber
                       Kirk Wallace Johnson
                       Jeff Bleich
                       Devon Hanley Cook

Monday - September 8, 2025                                    11:54 a.m.

                          P R O C E E D I N G S

                              ---o0o---

          THE COURTROOM DEPUTY:  All rise.  This Court is now in session, the Honorable William Alsup is presiding.

          THE COURT:  Good morning.  Please be seated.

          THE COURTROOM DEPUTY:  Calling Civil Action 24-5417, Bartz, et al. v. Anthropic PBC.

     Counsel, please approach the podium and state your appearances for the record, beginning with counsel for plaintiffs.

          MR. NELSON:  Good morning, Your Honor.  Justin Nelson from Susman Godfrey.  And with me -- I'm just going to go around the table -- my co-lead counsel, Rachel Geman, from Lieff Cabraser; Daniel Hutchinson from Lieff Cabraser; Nancy Wolff, Authors Coordination counsel from Cowan DeBaets; Eli Wade-Scott, Publishers Coordination counsel, from Edelson; Matt Oppenheim, Publisher Coordination counsel from Oppenheim Zebrak; Professor Sam Issacharoff from NYU Law School; Rohit Nath from Susman Godfrey; Elizabeth Cabraser from Lieff Cabraser; Yinka Onayemi from Fairmark Law, Authors Coordination counsel; Samir Doshi from Susman Godfrey; Craig Smyser from Susman Godfrey; Jallé Dafa from Leif Cabraser; Michael Adamson from Susman Godfrey; Jeff Gould from Oppenheim Zebrak; Danna Elmasry from Lieff Cabraser; and Jacob Miller from Lieff

Cabraser.

I'm also joined today by the CEO of the American Association of Publishers, Maria Pallante. Sitting next to her is Mary Rasenberger, the CEO of the Authors Guild. I'm also proud to represent our three clients who are here today, who have stepped forward to be very public faces in this suit: Andrea Bartz, Kirk Wallace Johnson, and Charles Graeber.

Thank you, Your Honor.

THE COURT: All right. Thank you. And welcome to all of you.

All right. And...

MS. DURIE: Good morning, Your Honor. Daralyn Durie from Morrison & Foerster, for Anthropic. I'm joined this morning by Doug Winthrop and Joe Farris from Arnold & Porter, Jeff Bleich and Devon Hanley Cook from Anthropic.

THE COURT: Okay. Welcome to all of you, as well.

Well, I am disappointed. You told me you wanted me to stay the case, which I mostly did. And that you would present a complete preliminary agreement, which is nowhere close. You gave me an agreement to agree. And now I'm -- the question is, do I put the case back on the litigation track and make you make up for lost time? That's -- we don't talk about that yet.

Have a seat. I want to get my list of grievances out. I thought I was misled. When you said you had an agreement in principle, about all I can see you had an agreement on is

1.5 billion.  And even that has some asterisks by it.  But the most important part is the claims process.

So I have a little speech I want to make in a minute about what I'm expecting you to do if you want to save this deal.  And I'm looking at the plaintiffs.  All of this -- and I hope there's not a -- no -- I'm getting ahead of myself.

Let's start with something easier.  You get to come forward.  You're supposed to have a list of works that has an ISBN -- whatever that number -- I-S -- give it to me again -- I-S something --

MR. NELSON:  ISBN, Your Honor.

THE COURT:  -- and then the four things that I laid out.  Is that ready, perfect?

MR. NELSON:  Yes, Your Honor.  We have given that -- per the Court's prior schedule, we gave that to Anthropic on September 1st.  There are approximately 465,000 works on that list as we speak.

THE COURT:  So that's final?  We're not going to add one more?

MR. NELSON:  Well, Your Honor, I can't say if --

THE COURT:  Ah-ah.

MR. NELSON:  The answer --

THE COURT:  This is what gets me.  All right.  Tell me the circumstances under which it could be increased.

MR. NELSON:  Well, the way that it's envisioned, as it

was under the trial schedule, is that Anthropic will have the same amount of time, which is until Monday, September 15th, to provide any revisions, subtractions, or additions to that list.

In the meantime, we are also continuing to go through it to make sure it is as complete and accurate as possible. And we hope to have that process done in the next week or two so it is --

THE COURT:  Not "next week or two."  I'm happy -- I can accept September 15th --

MR. NELSON:  Thank you, Your Honor.

THE COURT:  -- as the drop-dead date.  No additions thereafter.

MR. NELSON:  Thank you, Your Honor.

THE COURT:  All right.  Now, let's go to the second list, which is the people that get the notice.

Now, I want to say a little speech here.  For those of you who know me from prior cases, I feel like class members get the shaft in a lot of these cases.  Because once the money -- they don't -- the lawyers don't care anymore.  I'm exaggerating a bit.  And then it turns out that the number of people who actually get relief is a small fraction.  But there's a huge release going the other way.

And part of the reason is that they don't get enough notice, they don't get adequate notice, somebody wants to give them a post card notice, like you.  We're going to give the

class very good notice, including the author and including the publisher, so that these people over there get protected against a new claim coming out of the woodwork in the future. They deserve that.

Even if it was at 1.5 billion, if they settle the case, they get that guarantee.  So we need -- we need a class list that is final -- a works list that is final -- and then a class list that's going to get the notice.

Now, how close are we to the class list that gets the notice?

**MR. NELSON:**  I will turn it over to Ms. Geman just in a second.  But the two-sentence answer, Your Honor, is that we are close and -- we embrace what Your Honor says.  We believe that there will be -- that this is not an under-the-radar warranty case.  It was the front page of The New York Times, The Washington Post, all across.  But we're not just relying on that.  We're relying on the notice that will be provided. We're relying on industry groups, including those that are here today, to get that message out.  We are quite hopeful, Your Honor, that there will be an incredibly high claims rate.

And, with that, I'll turn it over to Ms. Geman.

**THE COURT:**  Good.

Let's hear -- let's hear -- what's your name over there?

**MS. GEMAN:**  Good afternoon, Judge Alsup.  Rachel Geman, Lieff Cabraser.

THE COURT:  Geman?

MS. GEMAN:  Geman.

THE COURT:  Geman.

Ms. Geman, go ahead.

MS. GEMAN:  Thank you, Your Honor.

So the notice plan that we've put before you is attempting to reach and will reach everybody.  You would have to not want to get notice to not get notice in this case.  In addition to the direct notice, which is both mail and email, we have social media, we have press, we have folks available to talk to people, we have the industry reaching out to people.  We already have contact information from -- that we've purchased through the Bowker source -- for a million or so publisher pieces of information.

Since the -- since the announcement -- since the settlement website went live on Friday, there's been more than 17,000 sign-ups, plus the sign-ups that my firm and --

THE COURT:  Say that again.

MS. GEMAN:  I'm saying even -- even as of now, before notice has commenced, the interest in the author community and the class member community has been huge.  The claims administrator has already had about 17,000 people register wanting to get more information.

THE COURT:  Wait, wait, wait.  So you've already got a claims administrator without my approval?

**MS. GEMAN:**  Well, Your Honor, if --

**THE COURT:**  I haven't even seen an agreement.  Some of these claims administrators, if you go and look at the statistics, have a very poor hit ratio on relief to class members.

**MS. GEMAN:**  We understand that, Your Honor.

**THE COURT:**  You've done this without my blessings.

**MS. GEMAN:**  Your Honor, we have proposed that JND will be the claims administrator.  This is a claims administrator that has a lot of experience with copyright cases, with large cases --

**THE COURT:**  What is their hit ratio on our court website for the percentage of the class that gets relief?

**MS. GEMAN:**  Well, Your Honor, they have been touted by a number of your fellow judges precisely for the good work they do in getting relief to class members, including in cases where it's crucially important that class members get relief.

For example, I used -- they were the claims administrator last year in a case where they were able to reach Colombian undocumented workers in a forced labor case that I had.  I mean, they are -- they are -- they excel at this.  Their hit rate's very good.

I can't give you an average across all their cases, sitting here now.  But I can represent to you, Your Honor, that I think the reason that your fellow judges continue to --

**THE COURT:**  I'd like to know these percentages and whether they'd even bother to file the required report that's -- there's a local rule that says that we have to have a -- for each class, at the end, there's a report.  And so we're supposed to learn how good the lawyers did, how good the class administrators did.

**MS. GEMAN:**  Absolutely, Your Honor.

**THE COURT:**  In this case, you've gone ahead and done it without my okay.

**MS. GEMAN:**  Well, Your Honor, we did propose JND after competitive bidding and notified them in our 815 submission.  Certainly, Your Honor, until Your Honor signs off on a settlement, there will be no notice administrator.  But we have started to gather information from class members, and we're happy to provide Your Honor with any information about them that --

**THE COURT:**  Well, I think I should be part of the preliminary approval -- if there is going to be preliminary approval -- is to bless a claims administrator and the identity of it and their fee; right?  Their fee.

**MS. GEMAN:**  Absolutely, Your Honor.

**THE COURT:**  Right.  So I interrupted you.  17,000 people have come forward and said something like, "I am an author and I'm very interested.  How do I get my money?"

**MS. GEMAN:**  Effectively, Your Honor.  I mean,

obviously, should the settlement be approved, and as we keep going, they'll get all of their formal choices.  But what I'm trying to underscore is we've had extraordinary interest in this case, and that reflects an extraordinary amount of exposure of this case.

In addition to the people who have simply signed -- you know -- submitted information since just over the last few days, I believe, as Your Honor knows, we had information from about 60,000 authors.  We have publisher information.  We have a lot of information, because we know Your Honor wants to move expeditiously.  And we are prepared to match the class works to the class list.

We have made clear that the website is not yet court-approved and that it will be used to gather information. We have been very clear that nothing will happen without court approval, but we -- and with apologies to Your Honor -- we did not think it was amiss and indeed we thought it was compliant with Your Honor's wishes to start to gather the contact information --

THE COURT:  All right.

MS. GEMAN:  -- to enable the most --

THE COURT:  I do agree that was a good idea.  And thank you for doing it.

MS. GEMAN:  Okay.  Thank you, Your Honor.

THE COURT:  I have a different question while you're

there.  This is hopefully an easier one.  The CAFA notice -- C-A-F-A notice -- what is -- is it really required in a federal case that you -- not a class action diversity case -- but in a federal case like this, is it required that we do this?

MS. GEMAN:  Yes, Your Honor.

I always have that same thought, and each time I have to look again, because it's counterintuitive.  But, yes, Your Honor, we do need to give CAFA notice.

THE COURT:  All right.  Okay.  I'm going to be asking, in a minute, for why we don't have a claims procedure agreed upon.

MS. GEMAN:  If Your Honor has more questions about notice --

THE COURT:  No, not yet, I don't.  I think you've done a good job of answering that.

MS. GEMAN:  With Your Honor's permission, I'll --

THE COURT:  It's got to -- okay.  It's going to be First-Class Mail with an envelope.  And it -- we might want to put on the return address of the U.S. District Court so they will know it's not junk mail.

We have to decide on what the form of the envelope says. I am also -- time wise I'm very worried that this October 10th date is ridiculous.  You're going to get this done way before then.  And it's -- we need to get the notice out so that class members have an opportunity to decide whether they want to

participate, whether they want to file a claim, to talk to their publisher, and to investigate the case.  Some people may decide to opt out.  And we have to give them adequate time to do all of that.

**MS. GEMAN:**  Agree, Your Honor.

**THE COURT:**  Okay.  You can have a seat.  Thank you.

**MS. GEMAN:**  Sure.  Your Honor, the -- and then I would just -- you know -- Your Honor, it sounds like, as a result of today, we will be submitting a revised notice document.  But I did want to point your attention that the JND dec in the record, Docket 363-12, does, for Your Honor's review, list the multiple and interacting kinds of notice to ensure the most -- you know -- the most fulsome possible --

**THE COURT:**  All right.

Write that down so we can look at it.

Thank you.

**MS. GEMAN:**  Thank you, Your Honor.

**THE COURT:**  All right.  Let's -- before I start pontificating -- and I have a few points I do want to make -- I'd like to hear what is going on behind the scenes.  Maybe it's all for the good.  But, you know, you are the class -- I have appointed two class -- there will be not one penny paid to any lawyer except class counsel.  So all these other lawyers that are out there hoping to get their fingers into the 1.5 -- not from me.

You are the class lawyer and Lieff Cabraser.  And you have taken it upon yourself to draw in this army of allied people to help solve this problem.  But don't -- they are not going to -- they get their money from somebody else, not from the 1.5 million -- billion.  So you have, again, exceeded your authority in hoping that they will be treated as class counsel.

MR. NELSON:  Well, thank you --

THE COURT:  That's speech number one.  But speech number two is I'm worried that you are working out, behind the scenes, between publishers some kind of a deal that you want to force down the throat of authors or -- mainly the authors -- and say you got to take X percent, even though their own agreements give them 100 percent.  If they did.  Maybe they don't.  Maybe they're silent.  Who knows?

I would like for you to explain what is going on between the guilds, the publishers.  What kind of deal are you trying to do behind the scenes?

MR. NELSON:  Thank you, Your Honor.

And for the distribution part of it -- and we do -- from a plan of allocation perspective, the plan of allocation is quite simple.  It's one approximately 3,000 payment per work.  The question is, when you have multiple payments, what do you do?  And there will be, in the vast majority of works here, potentially multiple claimants.

So what we have tried to do -- and as class counsel -- we

have tried, I think effectively, and with the advice of Professor Issacharoff, not taking a position on what that allocation will be.  Because we are not taking sides between authors and publishers with respect to that.

Instead, we have brought, under the supervision of a conciliatory process with former District Judge Layn Phillips, who conducted the underlying mediation here, an authors/publishers working group that has at the table the CEO of the Authors Guild and the President of the American Association of Publishers to try to work out whether we can do this in an effective and efficient manner to streamline the claims process.  That is what we're trying to do.  Those discussions already have started.

THE COURT:  Well, that sounds good -- that part.

MR. NELSON:  And --

THE COURT:  But what is the end product going to look like?

MR. NELSON:  I don't know, Your Honor.  Because those discussions are underway.  The whole objective here is to get to a result by which both publishers and authors are happy with or certainly can live with.

THE COURT:  Now, wait.  See, that's what bothers me. Because you've got somebody from the Guild who's going to force it down the throat of every author.

MR. NELSON:  Well, I don't --

THE COURT:  I don't think so.

MR. NELSON:  The whole idea, Your Honor, is to have a representative of authors at the table to make sure that there's -- no one is forcing anything --

THE COURT:  You are the representative of the authors.

MR. NELSON:  Thank you, Your Honor.

THE COURT:  You.  You got appointed to do that job.

MR. NELSON:  Thank you, Your Honor.  And we intend to make this settlement on the distribution process of course fair for every single class member.  That is our overriding fiduciary duty, and that's what we intend to do.  And so we are trying to bring folks to the table as opposed to class counsel saying, "Here's what it looks like, publishers.  Here's what it looks like, authors," to try to bring that to the table to have a productive, collaborative discussion, which has already gotten underway.

And, Your Honor, in terms of timing, these types of discussions really could not have occurred prior to having a deal with Anthropic.  And so that would really have put the cart before the horse if we had had at least any type of formal relation to start this process beforehand.

We did think it was appropriate -- and I did hear what Your Honor just said with respect to fees.  But we did think it was appropriate, once Your Honor issued the class certification order, to make sure that publishers, as well, were in the tent.

And I do hear you.  And I know you'll probably jump down my throat by saying it.  But I really would like the chance to revisit that at an appropriate point.  Because they have been beneficial to the entire class to make sure the entire class is represented.

THE COURT:  Right now, the answer is no.  But in the future, I could -- I can't say no to reconsidering in the future.  But every single one of these add-on lawyers and organizations is proceeding at their risk.  And maybe they get paid by the author.  Maybe they get paid by the publisher.  But to ask that they're going to get paid through the 1.5 billion directly by a court approved -- no, not yet, and probably never.  But I can't say "never"; I'll just say "probably never."

MR. NELSON:  Well, thank you, Your Honor.  And from the perspective of class counsel, we have both publishers and authors in our class.  And --

THE COURT:  This is the very problem they raised.  This is the very problem that counsel raised as to why this should not be certified.

MR. NELSON:  But it's -- it's -- the answers are the same.  And we are -- Your Honor said, in your class certification order, that publishers and authors will get together and work out an arrangement, which is exactly what is going on right now.

**THE COURT:**  No, individually.  One author, one publisher.  They would make a -- okay.  You have a seat.  I'm going to tell you -- this is not the only way it could be done, but I'll tell you one way it could be done.

**MR. NELSON:**  Okay.  Thank you, Your Honor.

**THE COURT:**  It could be done -- and it would -- at least, to that mind, would not involve the publishers trying to force every publisher to do the same thing.  It would not force every author to do the same thing.

And you may not like parts of this.  Because your fee would turn on how many actual claimants are paid.  It might be a small fraction of 1.5.  It might be all of 1.5.  But it would depend on -- all right.

No -- let me just start with the simple part.  The claim form would be signed by both the publisher and the author.  It would be joint.  It would be work-by-work.  So the ABC Publishing Company of New York City would not file a claim for 100 works.  It would file work-by-work.  And the author would have to be on each one -- the author or authors.

So why?  So that we would eliminate the problem of the author or their publisher coming back later and suing them and saying, well, wait a minute, we didn't agree to waive anything.  They would warrant -- publisher and author would warrant that they own the copyright and interest.  And that they would supply the legal papers that -- I'm sure they all have them --

that would show that they own the copyright and interest.

It would even be possible to say -- to say, once the money is paid, if somebody comes out of the woodwork and says, oh, wait a minute, we own that, that the authors and the publisher wouldn't indemnify Anthropic from defending that lawsuit.  That part I'm not so sure about.  It depends on how strong the paperwork is.

But when they pay that kind of money -- Anthropic -- they're going to get relief in the form of a clean bill of health going forward.  It would wipe this problem off their books as to each work on the list.  There cannot be a risk that they will be sued by somebody else on the very same thing.

So both the author and the publisher would sign and warrant that they own 100 percent of every -- the copyright interest and no one else owns anything.  That could be done.  But it would be harder than some kind of global deal among publishers.  This would not require any global deal among publishers or the Guild.  It would be one author and one publisher agreeing one-by-one.

No work -- if somebody is on the list -- if a work is on the list, and there's proper notice given, and no claim is submitted, the claim is forfeited, they get a release anyway.  Why?  This will force the authors and the publishers to come to terms.  Now, they can always opt out.  They can opt out.  But if they don't opt out, then they forfeit that money and it goes

back into the general pot.  And maybe then it gets redistributed pro rata.

These -- counsel fees would be based solely upon payouts, not based on the 1.5, unless all the 1.5 is paid out.  Then it would be.  It would be based on the benefit to the class.

We'd need a very -- well, I can accept September 15th as the deadline for the works list and the list of people who are going to get notice.  Then we -- then we get -- we send the notice out.

I -- all right.  I'm going to let you respond and try to explain what's crazy about what I'm thinking here.

MR. NELSON:  Well, let me --

THE COURT:  And also about -- I have a question about this re-inclusion scenario that I have never seen before.  But maybe that's reasonable.  But, okay, tell me what's wrong with what I just said.

MR. NELSON:  Well, let me start, actually, with what's easy and what I think we can absolutely agree with, which is Anthropic is paying $1.5 billion in the largest copyright recovery ever, to the best of our knowledge, and they should get a release for their past release.  And that's what we've negotiated.  That is the current drafting of the settlement agreement.  That there is -- if the work is on the list, the claim is released for that list.  That is how it is with respect to the scope of the release.  So that's the -- it's

easy to do.

What Your Honor just articulated in terms of the fee based upon payouts and the payouts that go along with it, we can -- we can defer fees.  Our fiduciary duty is to the class to make sure the class has the highest discovery.  Let's not talk about fees.  It's --

THE COURT:  All right.

MR. NELSON:  Okay.  So --

THE COURT:  Okay.  But I want you to be aware --

MR. NELSON:  I understand --

THE COURT:  -- that it's a benefit to the class.  And the 1.5 is not a benefit yet.

MR. NELSON:  Well, Your Honor, if I may, one materially better deal that we negotiated from how Your Honor articulated is that it is non-reversionary.

THE COURT:  I got it.

MR. NELSON:  Okay.  So 1.5 billion will be distributed minus fees and costs.  Okay?  That will happen.  They have agreed to that in a binding agreement, both a term sheet and a settlement agreement.  That will be paid -- 1.5 billion -- period.  Okay?  So that will be distributed.  If there are fewer claims for the works, the amount per work will go up.  It is our -- I'm sorry, Your Honor.

THE COURT:  The benefit to the class doesn't occur when the money goes into the pot.  The benefit occurs when Joe

Blow -- or those three people back there -- open their mail and there's their check for $3,000 or $6,000.  That's whenever the benefit has arrived at their doorstep, and that's when you get paid.

MR. NELSON:  We embrace that, Your Honor.

THE COURT:  Good.  We won't --

MR. NELSON:  And so -- I will say, just in terms of the notice process, there -- so the -- let me answer your last question about the re-inclusion process and -- because I think it's related to how Your Honor described the first two steps, which is the way the agreement is structured, and we think appropriately so, is that if one proper owner of the work, beneficial or legal, decides to opt out, it is not part of the class, for the very reason that Your Honor articulated, which is it would leave Anthropic open to exposure if one person -- one owner -- decided to have --

THE COURT:  And that book would be excluded.

MR. NELSON:  Correct.  Correct.

THE COURT:  So that's -- so that's too bad.

MR. NELSON:  Correct.

THE COURT:  What are they going to do; bring their own lawsuit?

MR. NELSON:  Well, no, but that's -- maybe.

THE COURT:  Are they -- that's just going to leave money on the table.

MR. NELSON: Right. But that will be their decision. And the point is, is that, as it's structured, we have a re-inclusion process in case one owner decides, originally, to opt out, and the other owner wants to stay in, that there can be discussions -- both really informal discussions, but also, if necessary, through a special master -- about, for example, do they have the right to opt out? Is that a right that is given to them by contract? And so to help decide some of those issues.

My concern, Your Honor -- and, look, we're at your Court's pleasure, obviously. And if this is how it ends up, we will deal with it. Okay? But it is materially more difficult -- we also want to make it easy to file a claim.

And my concern with how -- and maybe it's in the details of trying to work it out. My concern with how Your Honor articulated it is that it makes it so that it is incumbent upon each of the others to ensure that they can find the other, which is not necessarily possible with respect to every single work.

And so I think there are ways of dealing with Your Honor's concern -- appropriate concern -- about making sure that there is notice to every single legal and beneficial owner and also making sure that what Anthropic is getting is a release for the work without necessarily requiring there to be per claim form both entities to sign off and certify.

So I would -- we're happy to go back to the drawing board and try to figure it out with class counsel about what is the easiest and most effective way to address Your Honor's concern on that.

But what we have done -- what we've tried very hard to do -- is to have a process by which, as Ms. Geman just explained, everybody will get notice.  We are hopeful that it -- given, again, the very public nature of this lawsuit -- it's not going to go behind the scenes.  It's not going to be under the radar.  That publishers and authors, both themselves and also through their agents and their guilds, will know exactly what is going on.  And we will work quite cooperatively to try to get to a claim being filed.  So --

THE COURT:  So, see, I don't -- you're a brilliant lawyer.  Getting a claim filed is not good enough right now, in my view.  It's a joint claim filed.

To my mind, these add-ons that you brought in -- the Guild and the publishers -- a very important role they could serve here is to work with their constituents to help them put in a joint claim if there's any doubt about it.  The publishers ought to be in a position to do it really for everyone.  And if the authors trust them, then the authors just sign off.

But if there's any doubt, the Guild could help, the publishers group could help.  But I -- what I'm worried that you're trying to do, without telling me, is come up with some

subclass within -- or some class -- subclass settlement within the settlement between the publishers --

MR. NELSON:  Absolutely not.

THE COURT:  I'm sorry.  But I feel like it's better to go work-by-work, one work at a time, and have both the publisher and the author sign it.  We give them the money and then there's almost no chance at all there could be somebody coming out of the woodwork to sue the defendant.

MR. NELSON:  Yes.  I do hear that.  But there are going to be works, from either the publisher or the authors' side, where it can't find the other.  And that --

THE COURT:  Okay.  Give me an example.  I bet you that's 1 in 1,000 -- 1 in 200.

MR. NELSON:  Well --

THE COURT:  You're letting the tail wag the dog.

MR. NELSON:  Well, Your Honor, I mean, I can think of -- well, from both sides -- but let's just use the publisher who can't find the author; right?

THE COURT:  Well, like who?

MR. NELSON:  And --

THE COURT:  What publisher -- they know who the author is.  You're just saying that they've dropped off the planet and they're living in Idaho someplace?

MR. NELSON:  Your Honor, there are -- as you well know, there are plenty of examples where, over the course of

decades, it's -- they don't have up-to-date registration information or contact information.  Now, does it -- is it a widespread problem?  Perhaps either the authors' counsel or the publishers' counsel --

THE COURT:  Okay.  Let's take that case for a second and we'll see how you would handle it.  Let's say that the publisher wants to put in a claim and that the author cannot be found.  So how would that work?

MR. NELSON:  Well, sitting here, as I stand, I would think that if there has been proper notice that has been given to the class, then, just like any other class, that claim would be released, and the publisher can claim 100 percent of the work.  That would be my initial instinct.

THE COURT:  Well, if we can give notice to the class member -- the author -- how come the publisher can't find them?

MR. NELSON:  Well, maybe the author is dead.  Maybe we don't know -- maybe -- I mean, there's plenty of reasons why we --

THE COURT:  There's always a literary executor.

MR. NELSON:  Sometimes.  But -- and for major works, yes, but we're talking about 465,000 works, many of whom there are multiple authors.

So what happens, for example, if there are eight authors on a textbook?  Can they not claim if we can find seven of the eight and not the eighth?  I don't think that's fair to the

other eight -- the publisher plus the other seven authors.

THE COURT: Okay. So then what -- let's say that the author, number eight, winds up suing.

MR. NELSON: They will -- that won't happen for two reasons. Number one, okay, what author eight can do is opt out; right? It can decide if it is a properly -- it is a proper beneficial owner -- it has the right to opt out that entire work; right?

THE COURT: Well, is that true? Number 8 can opt out --

MR. NELSON: Yes.

THE COURT: -- the entire work?

MR. NELSON: Yes. Yes. That's why it's structured and that's why we have the re-inclusion. And that's to resolve exactly what Your Honor is asking about so that they will get a release and that there won't be some eighth author out there that will bring another claim. And that's why we structured it in this way.

So the opt-out solves that problem by saying in lieu of -- okay -- if you -- if there has been proper notice given and for -- again, in this example, there's one publisher and eight authors. And seven of the eight authors want to join and the publisher wants to join. The eighth -- if the eighth wants to opt out and is adamant about it, that work is not part -- is part of the cost but is opted out and counts towards our blow

provision.  Okay?  So that's number one.

Number two, let's say that we can't find author number eight -- okay -- for whatever reason.  You know, they've gone on, you know, a two-year sabbatical to Nepal or whatever.  Okay?  And they can't be contacted.  In that situation, just like in any other class, their claim would be released; right?  We've given proper notice.  We're having -- it's much more extensive than other copyright class actions.  And we're going to be I think well -- on the top end of the bell curve in terms of where we are in notice for this.  And after all that, if they don't file a claim or they can't be found, then the other seven plus the publisher should be able to claim for that.

THE COURT:  All right.  So let's take that case -- the guy comes back from Nepal and says, yeah, I never got the notice, and then sues all over again.

MR. NELSON:  That is -- then we'll point to the release.  Because that is standard -- just like -- just like if you had an Apple iPhone --

THE COURT:  Okay.  How many thousands of dollars will it take Anthropic to defend that case?

MR. NELSON:  It -- I mean, that is the same -- that is the same, Your Honor, as if -- that, you know, my iPhone -- whatever claim got settled yesterday on some consumer warranty case -- okay -- and with a 3 percent claims rate -- right -- that has a release.  Okay?  I guarantee you it will be much --

it's not going to be 3 percent.  It's not going to be 5 percent.  It's not going to be whatever -- we're going to be way higher than the FTC average here in terms of what it is.

And what happens in any of those cases?  In every single one of those cases, the claim is released.  And if there is a bogus, frivolous claim filed afterwards that says, "Actually, I didn't get proper notice."  We'll say, "Actually, no, you did get proper notice.  It satisfied all the requisites of due process.  It satisfied Rule 23," because Your Honor's going to ensure that it did.

THE COURT:  I would do my best.  But somebody still could come out of the woodwork.  And by making them sign up front in a joint request, we eliminate that risk.

MR. NELSON:  But there's -- then there's a prejudice to the other eight, in this example, owners.  Because, for whatever reason, this eighth is recalcitrant or, you know, can't be found or, you know, their literary estate is split eight different ways, or you -- I'm just now brainstorming off the top of my head about why it might not be possible to find it.  That is now prejudicing the rights of the other owners.

And the reason why we have a class action system to be able to deal with that and to give proper notice is because that claim is released.  Just like anything else, that person is releasing their claim.  There is no -- there is no right -- if you've gotten -- if there has been adequate and

constitutional due process notice that has gone out, which we will well exceed in this case, if they do not make a claim, that claim is released, just like any other class action.

THE COURT:  Well, it's not exactly -- in a lot of my class actions, I say if they didn't actually get the notice, they are excluded.  Some I have done that, because I'm worried notice to this many people is not going to be perfect.

And I understand what you're saying.  And that is the hard line rule.  That if the judge says it was adequate notice, then the release is active.

MR. NELSON:  And I think --

THE COURT:  But I don't like that.

MR. NELSON:  It --

THE COURT:  It bothers me that the lawyers hide behind that all the time trying to screw people out of their -- no -- I take that back.  You're not trying to screw anyone here.  But they get screwed in the end because they didn't get actual notice.

MR. NELSON:  Your Honor, we -- we -- let me try to say it a different way.  We care deeply -- okay -- that every single proper claim gets compensation.  Okay?

THE COURT:  All right.  I want you to have -- I'm still confused on why you need the Authors Guild in this picture at all.  Why can't we just proceed directly to notice and wait to see what claims come in?

**MR. NELSON:**  Well, the Authors Guild --

**THE COURT:**  Even if it's your type of claim.  Even if it's just a unilateral claim.

**MR. NELSON:**  Well, because there are -- there are -- what we have tried to envision, going back to your first two points, is to try to facilitate the claims process by saying that, for example, there are norms in terms of -- and baselines -- in terms of how many contracts are structured. And can we get to a way so that we can say, here is how the claim is going to be structured, and, you know, here is what the publisher and authors will be.

I don't know the -- just to be clear, I don't know the results of that.  I know that process has started in terms of having some of those discussions.  But what we are trying to do is trying to facilitate it so that both authors and publishers can get paid and can actually make claims.  We don't want to make something that is so difficult that no one is going to make a claim.

**THE COURT:**  You're the class counsel and you represent both authors and publishers.

**MR. NELSON:**  Yes, sir.

**THE COURT:**  You're the one that would normally do this.  And so why are you -- why are you bringing in big organizations on both sides and still -- I'm missing the boat on -- you could do it -- design a claim form that would be

perfect -- that would be adequate -- certainly adequate and close to perfect -- without these two organizations.

MR. NELSON: Well, we could, but we would -- potentially -- but we would potentially -- there's a potential that we would err on one side or the other. And it has been a part of our process from even before this class certification order to seek input from the key stakeholders here. And this is an area where of course they're going to have key input.

And so to be able to involve them in the process as opposed to class counsel simply saying, "Here's how it's going to be; take it or leave it," without seeking their input, seemed improper.

THE COURT: Let me hear from the other side. What would you like to say on this?

MS. DURIE: Good afternoon, Your Honor.

I think our only interest is in having a process that is as transparent as possible. We obviously want to ensure, as Your Honor has indicated, that we get peace and that there are not claims that come out of the woodwork. And we want to make sure, with respect to the list, that we have an opportunity to understand as fully as possible how the list was constructed. And then to the extent that it makes sense, add works to that list so that the scope of the list --

THE COURT: You've had that opportunity ad nauseum. You've had that opportunity. We had this discussion on what

the works are during the discovery phase.  And I issued orders and gave deadlines.  And so that opportunity has come and gone; hasn't it?

**MS. DURIE:**  Not with respect to the list that we received from the plaintiffs and the ability to add works to that list, both to make sure that the information on that list accords with our data -- cross-checking it with our data -- and then adding to the lists that the plaintiffs have provided to ensure it is as comprehensive as possible.

**THE COURT:**  I'm going to give you until September 15th.

**MS. DURIE:**  Understood.

**THE COURT:**  And I want a final never-to-be-changed-again list on the works and on the class people.  All right?  Both sides.  All right.  Do you agree?

**MR. NELSON:**  Thank you, Your Honor.  Yes.  We heard you.  Yes.

**THE COURT:**  No --

**MR. NELSON:**  Yes.

**THE COURT:**  "We heard you, yes," is not the same thing as "I agree."

**MR. NELSON:**  I agree, Your Honor.

**THE COURT:**  All right.  Thank you.

Now, I want to come back to my -- the way I think, if I was doing it, it would work.  But maybe -- I mean, you're the

ones who are supposed to come up with it.  I think it would be best to have a claim form signed by every interested author and the publisher.  All authors and all publishers if there are more than one.  It's conceivable you could design one that would have enough information that you could say, with confidence, that there will be no other claims.

I want to come to the special master thing.  The plaintiffs lawyers love "special master," because with that phrase is a cure-all for every evil.  It's not going to work here.  If there's going to be a dispute over ownership, it goes to state court or some other lawsuit.  It's not going to be in this court and it's not going to be with a special master, with one exception:  If both sides were to agree that a special master could hear it in this court, of course I would agree to that.  But if they don't both agree, then the jurisdiction is in state court or more on a diversity case, because we're talking about contracts here.  We're not talking about copyrights.

All right.  So don't think that special master is the cure-all for all disputes that you can't solve up front.

MR. NELSON:  And we do appreciate that, Your Honor.  And our thought actually was -- well, one of the purposes of the special master, or however we're going to deem it, was not so much to resolve disputes, although it does happen with respect to claims administration, but also to bring parties to

the table, for example, if one of -- one author -- this eighth author that we're talking about in our example -- wants to opt out, is there some private agreement that they can reach so that they can actually file the claim form and that work --

THE COURT:  Isn't that where the plaintiffs' lawyer comes in?  The eighth author calls you up and says, "We would like to file a claim.  We want to be part of this."

MR. NELSON:  Well, I think that's where -- I mean, they will get the notice and they will be able to do it.  We want to make it as easy and seamless as possible.  And, again, you know, a lot of the authors or the authors' estates might not know who their publisher -- or who currently owns the rights.  Because, remember, let's say a book came out in 1985.  Okay?  And that imprint no longer exists.  Okay?  Are we going to put it on the author to try to figure out who the current --

THE COURT:  That's where you come in.  You should have -- how many people did you introduce here?

MR. NELSON:  A lot, Your Honor.

THE COURT:  At least 15.  Three or four of them could have a full-time job tracking that down.  They call you on the phone.  They say, you know, our publisher is no longer in existence.  They got merged with somebody else.  Could you help me figure it out?  Sure, that's our job.  We are the class counsel.  We will get right back to you.  Click.  And then you find out the answer.  You call them and give them the

information.  You don't have to have a special master to -- shed your job off onto the special master.

MR. NELSON:  No, Your Honor.  And that was not our thought.  Let me try it a different way, which is that there are going to be some times that everybody has gotten proper notice; they know who to contact.  And there might be some question about whether they want to opt in -- or file a claims form or opt out.  And in that circumstance --

THE COURT:  That's where you come in.  You're their lawyer.

MR. NELSON:  Okay.

THE COURT:  You tell them.  You advise them.  They don't need a special master for that.

When am I going to see -- and it can't be October 10th -- it's got to be in the next week or two -- an agreement -- the claim form -- the claim form and the claim form process?

MR. NELSON:  We will -- I hear you that it will not be October 10th, and that that is too far out.  My suggestion would be -- if the works list is complete on September 15th, it will take a week or two to actually get notice out the door from after there's a complete works list.  So we could do it simultaneously with -- we could do it, for example, September 29th, or something along those lines.

THE COURT:  When you say "do it," what does that mean?

MR. NELSON:  To file it with the Court for approval so

that we can -- I mean -- or at Your Honor's pleasure.  But we can do it -- we can file something on September 22nd, so on September 29th --

THE COURT:  Yeah, the 22nd.

MR. NELSON:  -- it's ready to go.

THE COURT:  You should have the benefit of your working groups and a proposed claim form that both sides agree to and a procedure that will be followed to approve or disapprove those claims.  And submit that to me.  That's a very important part of preliminary approval.  I have to approve the plan of distribution.  And we don't even have one yet.

MR. NELSON:  Well, thank you, Your Honor.  I do think -- and, again, at the risk of not making the Court happy -- I do think Your Honor can do preliminary approval today.

THE COURT:  No.

MR. NELSON:  Okay.

THE COURT:  It's not going to happen today.

MR. NELSON:  Okay.

THE COURT:  Too many open issues.

MR. NELSON:  Okay.

THE COURT:  I don't -- I have an uneasy feeling about all of these hangers-on that are in the shadows.  When this kind of money gets on the table, people come out of the woodwork.  And they want a piece of the action and some kind of

deal behind a deal is underway.  And I don't like the sound of it.

MR. NELSON:  It --

THE COURT:  So I want to see it for myself.  I want to see the claim form.  I want to see the claims process.  I don't want things being shoved off onto a special master.

MR. NELSON:  We hear you.  We --

THE COURT:  I'll deny it for the time being, without prejudice to submitting more information.

MR. NELSON:  Thank you, Your Honor.  And --

THE COURT:  Now, the other question is, do we reactivate the litigation?

MR. NELSON:  Well, Your Honor, I don't think that's necessary.  I think that Anthropic has given its binding commitment to pay the $1.5 billion.  These issues that you're talking about right now are distribution issues, which are incredibly important.

THE COURT:  Exactly.

MR. NELSON:  And I don't -- I'm not -- but there is -- we should be able to work them out quickly.  We have every incentive to work them out quite quickly.  The --

THE COURT:  All right.  I'm going to give you that chance on this schedule that we've agreed to.
September 15th is one date.  September 22nd is another.

MR. NELSON:  And thank you -- thank you, Your Honor.

Is -- are we putting a date -- September 22nd is to submit something to the Court?

THE COURT:  To the Court so that we can look at it and see if -- if I -- it answers the questions or at least if the -- something close enough that I can say I hold my nose and approve it.

MR. NELSON:  Thank you, Your Honor.  And then there will be a further preliminary approval hearing the week of September 22nd?

THE COURT:  Let's set a date for -- am I here on the 25th?

THE COURTROOM DEPUTY:  You are, Your Honor.

THE COURT:  What time could we do it?

I remember I got to go see the doctor, I think, on that day.

THE COURTROOM DEPUTY:  We could -- well, perhaps set -- we have three hearings at 11:00.

THE COURT:  Is that all?

Why don't we say 1 o'clock.  1 o'clock on September 25th.

MR. NELSON:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.  See you then.

THE COURTROOM DEPUTY:  Court is adjourned.

(Proceedings adjourned at 12:49 p.m.)

---oOo---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, September 9, 2025

_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court