EDELSON PC
Jay Edelson (pro hac vice)
J. Eli Wade-Scott (pro hac vice)
350 North LaSalle, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

EDELSON PC
Brandt Silverkorn (SBN 323530)
150 California St., 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

OPPENHEIM & ZEBRAK, LLP
Matthew J. Oppenheim (pro hac vice)
Jeffrey M. Gould (pro hac vice)
4530 Wisconsin Avenue, NW, Fifth Floor
Washington, DC 20016
Tel:  202-480-2999

*Publishers' Coordination Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, AND MJ + KJ, INC., individually and on behalf of others similar situated,<br><br>                  Plaintiffs,<br><br>   *v.*<br><br>ANTHROPIC PBC,<br><br>             Defendants. | Case No. 3:24-cv-05417-WHA<br><br>Hon. William Alsup<br><br><br>**DECLARATION OF PUBLISHERS' COORDINATION COUNSEL JAY EDELSON AND MATTHEW J. OPPENHEIM IN SUPPORT OF SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT** |

Pursuant to 28 U.S.C. § 1746, Jay Edelson and Matthew J. Oppenheim jointly declare and state as follows, except where specified:

1.      We are Publishers' Coordination Counsel in the above-captioned action. We make this declaration in support of Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Approval of Class Settlement.

**Background Regarding Edelson PC, by Mr. Edelson Only**

2.      I, Jay Edelson, am the Founder and CEO of Edelson PC, which has been engaged as Publishers' Coordination Counsel in the above-captioned action. I am over the age of 18 and fully competent to make this Declaration.

3.      I have personal knowledge of the facts set forth herein and if called upon to testify as a witness, I could and would competently testify hereto.

4.      I have over two decades of experience representing plaintiff classes. I've been named three times by Law360 as a "Titan of the Plaintiffs Bar," and by Forbes as one of "America's Top 200 Lawyers." I was also named to Fast Company's "Most Creative People in Business" list, where I was the first plaintiffs' attorney to ever receive that recognition.

5.      My firm has over 100 attorneys and staff across six offices, including Chicago and San Francisco. The firm is structured around dedicated teams that allow our attorneys to devote their full resources and attention to each stage of the case: a dedicated Investigations team, Litigation team, and Appellate team (among others). Particularly relevant to our work in technology cases, we have a unique-in-the-industry forensic investigations lab, staffed by non-lawyer technologists and led by the firm's Chief Technologist, Shawn Davis.

6.      We have been named, in multiple years, a Consumer Protection Group of the Year (2016, 2017, 2019, 2020), a Class Action Group of the Year (2019), a Plaintiff's Class Action Powerhouse (2017, 2018, 2019), and a Cybersecurity and Privacy Group of the Year (2017, 2018, 2019, 2020, 2022, 2023) by Law360. The National Law Journal also recognized us as "Elite Trial Lawyers" in Consumer Protection (2020, 2021), Class Action (2021), Privacy/Data Breach (2020), Mass Torts (2020), and Sports, Entertainment and Media Law

(2020). Just considering cases where we have served as lead counsel, our verdicts and settlements exceed $5 billion.

7.      In cutting-edge technology cases, particularly, my firm's track record is unparalleled.  The *New York Times* called me "Tech's Least Friended Man" for my firm's innovation and success in bringing technology-related class actions, and observed that our cases "read like a time capsule of the last decade, charting how computers have been steadfastly logging data about our searches, our friends, our bodies."[1]

8.      We filed the first-ever case under the Illinois Biometric Information Privacy Act ("BIPA"), which resulted in the largest single-state privacy settlement ever at $650 million, which was reached on the eve of trial. *See In re Facebook Biometric Information Privacy Litig.*, 522 F. Supp. 3d 617 (N.D. Cal. 2021). In approving the settlement, Judge Donato of this District noted the "landmark result" achieved for the Class, observing that Edelson and its co-counsel had produced a "major win for consumers in the hotly contested area of digital privacy." 522 F. Supp. 3d at 620-621.

9.      We've secured more than $700 million in settlements and verdicts against illegal online casinos under Washington State's gambling laws after winning a watershed Ninth Circuit victory for consumers against such companies in *Kater v. Churchill Downs Inc.*, 886 F.3d 784 (9th Cir. 2018). When assessing the fairness of one of those settlements for $415 million, Judge Lasnik of the Western District of Washington described how my firm worked "in the Executive branch, the legislative branch, and the Judicial branch" to secure an extraordinary result for its clients in a "unique" case—describing the firm as "all in with high quality and very admirable lawyering[.]" *Benson v. DoubleDown Interactive LLC*, No. 18-cv-00525, dkt. 550 (W.D. Wash. June 22, 2023).

10.     The firm was lead counsel in *Spokeo v. Robins*, in which the Supreme Court held that "intangible harm" could satisfy Article III standing requirements. *See* 136 S. Ct. 1540

---

[1]      Conor Dougherty, *Jay Edelson, the Class-Action Lawyer Who May Be Tech's Least Friended Man*, N. Y. TIMES (Apr.4,2015), https://www.nytimes.com/2015/04/05/technology/unpopular-in-silicon-valley.html.

(2016). Commentators called the case "the most important privacy class action and consumer case of the decade."[2]

11.     We also have deep experience in AI cases, where we have been at the forefront of AI issues since the advent of this industry. We represent governments in first-of-their-kind enforcement actions tackling harm to teens from social media AIs. We also represent families individually against AI companies for encouraging and amplifying teenager self-harm.  And we secured a consent decree from Clearview AI—in what's been called a "milestone for civil rights"—that bans Clearview's AI-powered face recognition from the private market. *American Civil Liberties Union v. Clearview AI, Inc.*, No. 20 CH 4353 (Cir. Ct. Cook Cty.).[3]

12.     Our firm has had particular success in trying class action cases, where we've prevailed in four class action trials in recent years. The largest single damages verdict was a $925 million verdict in a privacy case, *Wakefield v. ViSalus, Inc.*, No. 3:15-cv-1857-SI (D. Or. June 24, 2019).[4] In a case on behalf of a class of wildfire survivors in Oregon against the local utility, PacifiCorp, the jury found PacifiCorp liable to the entire class—finding that it recklessly caused the Labor Day 2020 wildfires—and awarding punitive damages classwide. The jury also awarded more than $90 million to the 17 plaintiffs. Subsequent damages trials have resulted in over $500 million in verdicts to date, with thousands of people in the class to go—paving the way to billions in liability.

13.     Finally, my firm is one of the most outspoken voices in reforming the Plaintiffs' bar. As just one example, we exposed attorney Tom Girardi's decades-long client Ponzi scheme that stole more than $100 million from clients and others. I have long advocated for higher

---

[2]     *See John K. Higgins, Supreme Court to Hear 'Non-Injury' Privacy Class Action*, E-COMMERCE TIMES (May 6, 2015), https://www.ecommercetimes.com/story/supreme-court-to-hear-non-injury-privacy-class-action-82015.html.
[3]     *See S.T.O.P. Welcomes Clearview AI, ACLU Settlement, Calls For National Ban*, SURVEILLANCE TECHNOLOGY OVERSIGHT (May 9, 2022),https://www.stopspying.org/latest-news/2022/5/9/stop-welcomes-clearview-ai-aclu-settlement-calls-for-national-ban.
[4]     The verdict was later vacated, with the Ninth Circuit holding that the lower court had to consider whether the damages awarded by the jury potentially violated due process. *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1125 (9th Cir. 2022).

1    claims rates—an issue on which we lead the industry in routinely securing 20%+ claims rates,

2    including in the *Facebook* settlement mentioned above.

3    **Background Regarding Oppenheim + Zebrak, LLP ("O+Z"), by Mr. Oppenheim Only**

4         14.    I, Matthew J. Oppenheim, am the Co-Founder and Managing Partner of O+Z,

5    which has been engaged as Publishers' Coordination Counsel in the above-captioned action. I am

6    over the age of 18 and fully competent to make this Declaration.

7         15.    I have personal knowledge of the facts set forth herein and if called upon to testify

8    as a witness, I could and would competently testify hereto.

9         16.    I have over 30 years' experience representing content owners, including education

10    and trade book publishers, in their content protection efforts, including in several of the most

11    preeminent and influential copyright infringement cases of our time. I have been honored with

12    recognitions by many different groups. *Chambers USA* has ranked me multiple times as a

13    leading intellectual property litigation lawyer and *Super Lawyers* has identified me multiple

14    times as a "Top Rated Intellectual Property Litigation Attorney in Washington, DC." I have been

15    repeatedly named to the *Best Lawyers in America*® list for Copyright Law, and by *Law360* as a

16    "Titan of the Plaintiffs Bar." *Legal 500* described me "as a premier litigator regarding complex

17    disputes for technology, copyright, and trademark cases." *Billboard* magazine has named me

18    multiple times to its distinguished "Top Music Lawyers" list, which honors lawyers on the front

19    lines of the music industry's legal battles and deals.

20         17.    O+Z, which I co-founded in 2011, has 35 attorneys and staff across two offices,

21    including Washington, D.C. and New York. Our firm is comprised of lawyers dedicated to

22    helping clients with adversarial matters involving copyright and trademark infringement,

23    artificial intelligence, piracy, counterfeiting, royalty disputes, and other commercial disputes.

24    O+Z prides itself on being the go-to copyright litigation firm for many of the biggest content

25    companies in the world, including numerous book publishers. O+Z has a proven track record of

26    successfully litigating in court, negotiating private resolutions, and providing thoughtful

27    guidance on copyright and trademark issues.

18.     O+Z has been recognized, multiple times, by *Chambers USA*, *Super Lawyers*, and *Managing IP* as leaders in intellectual property and copyright law. Chambers has reported that O+Z is "very aggressive and very creative in pursuing theories to protect trademark and copy owners' rights" and "is utterly fearless in taking on the biggest companies and very knowledgeable about copyright technology cases." *Managing IP* selected O+Z as the Copyright Firm of the Year for the Eastern half of the United States in 2021. Myself and several of my partners have also been recognized multiple times by *Billboard* magazine as the "Top Music Lawyers" and by *Legal 500* as a "Leading Firm." In addition to calling O+Z "among the best of the best copyright litigation firms," *Legal 500* testimonials also described O+Z as having the "highest level of expertise in copyright litigation" and a "deep bench" of "experienced and polished trial lawyers," who are "both smart and strategic."

19.     O+Z is a litigation boutique. Prior to this matter, we had never served as counsel in a class action. While we have been involved in many very large copyright cases, they have all been mass enforcement cases where we represent individual plaintiffs asserting claims on their own behalf.

20.     O+Z has litigated numerous BitTorrent copyright infringement cases, including against several internet service providers. *See Cox Commc'ns v. Sony Music Entertainment et al.*, No. 24-171 (U.S.) (on appeal to the U.S. Supreme Court after $1 billion jury verdict finding Cox liable for contributory and vicarious copyright infringement of more than 10,000 sound recordings and musical compositions); *Warner Records Inc et al., v. Charter Commc'ns, Inc.*, 1:19-cv-00874 (D. Colo.) & *UMG Recordings, Inc. et al., v. Charter Commc'ns, Inc.*, 1:21-cv-02020 (D. Colo.) (settled parallel peer-to-peer copyright infringement cases involving more than 13,800 sound recordings and musical compositions)); *UMG Recordings, Inc. et al., v. Bright House Networks, LLC.*, 8:19-cv-00710 (M.D. Fla.) (settled peer-to-peer copyright infringement case involving more than 7,500 sound recordings and musical compositions); *In re Frontier Comm'ns Corp.*, 20-22476 (Bankr. S.D.N.Y.) & *UMG Recordings, Inc. et al., v. Frontier Comm'ns Corp.*, 1:21-cv-05050 (S.D.N.Y.) (settled parallel peer-to-peer copyright infringement

cases involving more than 12,000 sound recordings); *Warner Records Inc. et al v. Altice USA, Inc.*, 2:23-cv-00576 (E.D. Tex) (similar pending case involving more than 10,000 sound recordings and musical compositions); *UMG Recordings, Inc. et al v. Verizon Commc'ns Inc.*, 1:24-cv-05285 (S.D.N.Y.) (similar pending case involving more than 17,300 sound recordings)); and *Grande Commc'ns Networks LLC v. UMG Recordings, Inc. et al.* (No. 24-967) (U.S.) (certiorari petition filed by Grande to U.S. Supreme Court after $47 million jury verdict in favor of music companies).

21.     As a trial lawyer, I have served as lead counsel in obtaining many of the largest copyright and trademark verdicts in history. This includes a $1 billion jury verdict for the music industry against Cox Communications for its illegal downloading, copying and distributing of copyrighted music through BitTorrent. This verdict was reportedly the 5th largest jury verdict in the United States in 2019, and one of the largest copyright statutory damages awards ever. (*Sony Music Entertainment et al.*, *v. Cox Comm'ns, Inc. et al.*, Case No. 1:18-cv-950-LO-JFA (E.D.VA)).[5]

22.     Over the years, O+Z has served as the primary counsel to the publishing industry dealing with the problem of mass counterfeiting of physical books. In this vein, we have brought claims against numerous distributors of illegal counterfeit books. *See John Wiley & Sons, Inc. et al.*, *v. Rivadeneyra*, 2:2013-cv-01085 (D.N.J.); *The McGraw-Hill Companies, Inc., et al.*, *v. Chuck Jones, et al.*, 5:14-cv-0042-TBR-LLK (W.D. Ken.); *Cengage Learning, Inc. et al., v. Follett Corp. et al.*, 1:17-cv-04672-PKC (S.D.N.Y.); *Cengage Learning, Inc. et al. v. Appalacian Inc. et al.*, Civil Action No. 17-cv-1009 (MCA) (LDW); *Pearson Educ., Inc. et al.*, *v. Rentu.com, LLC*, 2:18-CV-0040 (DLB)(CJS) (E.D. Ky.); *Pearson Educ., Inc. et al.*, *v. C&N Logistics, Inc.*, Case No. 3:18-cv-00438 (M.D. Tenn.); *Cengage Learning, Inc. et al.*, *v. Morena for Int'l Trading*, 19-cv-1727 (N.D. Ill.); *McGraw Hill LLC et al.*, *v. Radius Int'l, Inc.*, 1:21-cv-04325

---

[5] The verdict was later vacated, with the Fourth Circuit affirming willful contributory liability for over 10,000 copyrights but reversing the jury's vicarious liability finding and remanding for retrial on damages. The case is currently before the U.S. Supreme Court with a ruling expected in mid-2026.

1  (N.D. Ill.); *Pearson Educ., Inc. et al., v. Bookholders LLC*, PX-21-cv-0594 (D. Md.);

2  *Pearson Educ., Inc. et al., v. Hasan, et al.*, No. 1:23-cv-07284-PAC (S.D.N.Y.).

3      23.    Also, among the counterfeiting cases we handled was a case against a commercial

4  book distributor who served as the back end of Amazon's book rental program. There, I served

5  as lead trial counsel in obtaining a large jury verdict against a U.S. commercial book distributor

6  for willful copyright and trademark and infringement, that awarded copyright statutory damages

7  of $100,000 per work, and maximum trademark damages of $2 million per mark, along with a

8  fee award and a permanent injunction against any further infringement, arising from the

9  defendant's import and sale of counterfeits. The verdict was upheld by U.S. District Judge

10 William H. Pauley III. This trial was fundamental to the book publishing industry's fight to

11 ensure distributors adequately safeguard against counterfeits. (*John Wiley & Sons, Inc. v. Book*

12 *Dog Books, LLC*, 327 F. Supp. 3d 606 (S.D.N.Y. 2018)).

13     24.    As part of our efforts to address the systemic counterfeiting problem, O+Z

14 worked with the publishing industry and with the book distributors to develop Best Practices for

15 distributors. Those Best Practices have been widely adopted and stopped a significant amount of

16 the counterfeiting that was plaguing the industry. *See* https://stopcounterfeitbooks.com/;

17 https://stopcounterfeitbooks.com/barnes-noble-education-major-educational-content-providers-

18 commit-to-fight-counterfeit-textbooks/.

19     25.    I have also been counsel in numerous high profile and important copyright cases

20 over the last several decades, including: *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004 (9th

21 Cir. 2001) (enjoining Napster from using its peer-to-peer service, in effect, shutting down the

22 company); *In re: Aimster Copyright Litigation*, 02-4125 (7th Cir. 2003) (upholding preliminary

23 injunction shutting down peer-to-peer file-sharing service); *MGM v. Grokster*, 545 U.S. 913

24 (2005) (finding Grokster, a company that distributed and promoted software to infringe

25 copyrights, liable for resulting acts of infringement); *Sony BMG Music Entertainment, et al., v.*

26 *Tenenbaum*, No. 12-2146 (1st Cir. 2013) (upholding judgment in favor of record companies for

27 willful copyright infringement); *Capitol Records, Inc. v. Thomas-Rasset*, No. 11-2820 (8th Cir.

2012) (upholding judgment in favor of record companies for willful copyright infringement); *Hachette Book Group, Inc. v. Internet Archive*, No. 23-1260 (2d Cir. 2024) (affirming ruling that Internet Archive's system of scanning physical books to convert into e-books was not fair use). I was personally involved in these prominent cases, securing wins for the content owners.

26.    O+Z also has deep experience in AI cases including in the book publishing and music industries. Our lawyers are regularly called upon to speak at CLE events, and provide background information for members of Congress.  We are representing several music publishers in a case similar to this one against Anthropic, which we filed in 2023. (*Concord v. Anthropic*, Case No.  5:24-cv-03811 (N.D. Cal.)). O+Z is also representing several news publishers including Condé Nast, The Atlantic, and Vox in a copyright and trademark infringement action against Cohere, an artificial intelligence company, for its unauthorized use and copying of the publishers' news and magazine articles and brand names. (*Advance v. Cohere*, 1:25-cv-01305 (S.D.N.Y)).

**Our Firms' Work as Publishers' Coordination Counsel, by Mr. Edelson & Mr. Oppenheim**

27.    On August 11, 2025, Class Counsel filed a Notice of Association of Additional Counsel, informing the Court that Edelson PC and O+Z—would serve as "Publishers' Coordination Counsel" ("PCC"). However, our work in this matter began weeks earlier.

28.    After the Court issued its July 17, 2025, Order on Class Certification, representatives from certain publishers began engaging with Class Counsel and sought additional counsel to assist in representing the interests of publishers in the common goal of maximizing the per-work recovery for the Class. Indeed, Class Counsel invited the active participation of publisher class members through the PCC, based on publishers' deep knowledge in copyright law and the publishing industry, value they could bring to the class as a whole, and because the class as originally proposed consisted of authors only.

29.    I, Jay Edelson, along with other attorneys at my firm, began speaking with publishers regarding this matter on July 26, 2025 (a Saturday). I spoke with individual publishers and as a group repeatedly in the ensuing days.

30.     I, Matthew Oppenheim, began speaking with publishers regarding this matter on approximately July 16, 2025, after the summary judgment decision was issued. Those discussions continued on July 18 immediately after the Class Certification Order was issued. I spoke with individual publishers and as a group repeatedly in the ensuing days.

31.     Edelson and O+Z spoke jointly to the publishers on July 31. Since that initial July 31 meeting, our firms have engaged in near-daily (and often many-times-daily) meetings with legal teams from AAP, the Publishers Association of the UK (PA), the Association of University Presses, as well as numerous major trade, education, and independent publishers. These organizations and businesses dedicated their highest-level in-house counsel to this case for months at no cost to the class.

32.     Through these meetings, the PCC identified executive-level witnesses from the publishers who volunteered to testify about how their industry works, the creative, educational and scientific importance of books, as well as their efforts to fight piracy and the harm that comes from that piracy. The PCC then worked with those witnesses to gather documents for expedited production in advance of trial and provide for their depositions.

33.     Meanwhile, the PCC joined Class Counsel's trial strategy meetings, weighing in on expert witness strategy and the trial plan.

34.     The PCC engaged in an all-out effort to assist Class Counsel in compiling the Works List, committing a team of lawyers with extensive experience clearing works for inclusion in copyright cases. The PCC's attorneys worked full-time for weeks with Class Counsel's team of lawyers, staff, and experts to refine the technical analysis to assess works for satisfaction of the class criteria, including by searching copyright office databases, identifying ISBNs, and matching works to the criteria for class inclusion.

35.     With that assistance from the PCC, Class Counsel was able to refine these matching processes and identify works which otherwise may not have been included. These efforts resulted in a Works List at least 20% larger than otherwise. Through the extensive efforts of the publishers and PCC, we were able to help the Class submit the Works List on the Court's

1    schedule.

2        36.    The PCC participated in the negotiations for the benefit of the entire class. The

3    publishers' bargaining power and our own experience negotiating large settlements of this kind

4    played a critical role in this settlement's outcome. Based on our extensive background in these

5    matters, we believe this $1.5 billion settlement would not exist but for the contributions of the

6    publishers and PCC.

7        37.    None of the publishers have paid us anything and have disclaimed payments

8    outside of the class action. The publishers are not paying our costs, and have disclaimed

9    reimbursement of costs outside the class action process. Nor did we ask for fees or costs directly

10   from the publishers: our role is representing publishers' interests as a whole.

11       38.    The PCC proposed the incredibly claimant-friendly distribution process—which

12   we believe to be the most claimant-friendly ever designed—including the multiple opportunities

13   for claimants to receive payment, automatic checks if claimants do not file a claim, and 18

14   months to come forward to collect their distribution.

15       39.    Throughout the PCC's involvement, the PCC firms devoted multiple attorneys

16   full-time—including mornings, nights, and weekends—to meet the Court's deadlines and

17   prepare to conduct a trial that included new publisher witnesses, and then to work towards the

18   settlement that has been negotiated in this case.

19       We declare under penalty of perjury that the foregoing statements (where made by the

20   respective signer) are true and correct.

21   Executed on this 22nd day of September, 2025 by Jay Edelson at Chicago, Illinois.

22                                    /s/    **JAY EDELSON**

23                                    Jay Edelson

24   Executed on this 22nd day of September, 2025 by Matthew Oppenheim at Washington,

     D.C.

25

26                                    /s/    *Matthew J. Oppenheim*

                                      Matthew J. Oppenheim

27