UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA BARTZ and KIRK WALLACE JOHNSON, individually, and ANDREA BARTZ, INC., CHARLES GRAEBER, and MJ + KJ, INC., individually and as representatives of the class,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | No. C 24-05417 WHA<br><br>**MEMORANDUM OPINION ON PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |

## INTRODUCTION

In this copyright action, the district judge granted preliminary approval to the class settlement, preliminary approval to the plan of distribution, and preliminary approval to the plan for notice. This opinion memorializes the main points, plus addresses counsel's changes to the form of notice, on which preliminary approval also depended.

## STATEMENT

On August 19, 2024, plaintiffs brought suit against defendant Anthropic PBC. On August 25, 2025, the parties signed a term sheet. And, on September 5, they signed a proposed settlement agreement (Dkt. No. 362-3).

The district court reviewed all filings in support of this proposed settlement (Dkt. Nos. 360, 362–63, 365, 380, 382, 385–401, 404–19, 422; *see* Dkt. Nos. 432–34). We held two hearings, on September 8 and 25. The second ended in preliminary approval.

## ANALYSIS

**1. LEGAL STANDARDS.**

To grant preliminary approval to a class settlement, the district court must find it "*will likely* be able to[ ] (i) approve the proposal [finally] under Rule 23(e)(2)[ ] and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B) (emphasis added). If both are met and no class notice yet given, the court must then order "the best notice that is practicable under the circumstances." *Id.* 23(c)(2)(B); *see id.* 23(e)(1) note, 23(c)(2) note.[1]

**2. PRELIMINARY APPROVAL.**

**A. LIKELY TO CERTIFY CLASS FOR PURPOSES OF JUDGMENT.**

Classwide resolution remains proper for the reasons set out in the class certification order, and will likely remain proper for entering final judgment. "If the court has already certified a class, the only information ordinarily necessary [to consider at preliminary approval] is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted." *Id.* 23(e)(1) note.

Here, the settling class is substantially the same as certified, with these <u>clarifications</u>:

> All beneficial or legal copyright owners of the exclusive right to reproduce copies of any book in the versions of LibGen or PiLiMi downloaded by Anthropic <u>as contained on the Works List</u>. "Book" refers to any work possessing an ISBN or ASIN which was registered with the United States Copyright Office within five years of the work's <u>first</u> publication and which was registered with the United States Copyright Office before being downloaded by Anthropic, or within three months of <u>first</u> publication. Excluded are the directors, officers and employees of Anthropic, personnel of federal agencies, and district court personnel. <u>For avoidance of doubt, only works included on the Works List are in the Class.</u>

As clarified, any doubt about a work's operative publication is now removed. *See* 17 U.S.C. §§ 410(c), 412(2). The class certification order recognized that the related limitations let all class works use registrations as evidence of certain facts and pursue statutory damages.

And, as also contemplated by the class certification order and clarified here, the "books" at issue are now expressly identified as those in the Works List (Dkt. No. 422). The class

---

[1] All citations to a Rule 23 "note" are to the advisory committee's note to the 2018 amendment.

certification order already required plaintiffs to prepare a per-work list. It further anticipated that the per-work list would serve a dual purpose: as a common contact sheet for notifying all class members, and as common trial evidence for proving infringement for all class members (based on common evidence and methods underlying its preparation). The assessment behind both was that the per-work list would distill all works that met all the class definition's works-related criteria. If despite this effort a work did *not* appear on the per-work list but did meet the class definition, then reasonable individual notice efforts might overlook a work and its copyright owners — and leave ambiguous in any future litigation against Anthropic whether claims respecting that same work had been released. *Now, underscored by this clarification, if a work is not on the Works List, then a copyright owner of the right to reproduce that work is not in the class* (unless as an owner with respect to another work that is on the list).

Further to this point, both parties have accepted the district court's suggestion respecting the Works List: For settlement purposes only, the parties have stipulated that the listed works meet all works-related criteria, including timing of registration, publication, and downloading. This leaves class members to prove only their ownership of the relevant rights (Dkt. No. 418 ("Joint Answers") Q. 33; *see also* Dkt. No. 432-2 ("Long-Form") FAQs 6, 48).

As for these owners, the proposed settlement calls for no further clarification. The class still comprises beneficial and legal copyright owners of the right to reproduce any qualifying work. Such owners include authors and publishers. The class representatives are authors or their loan-outs. No publishers are serving. The authors so far appear to be advocating for all, as anticipated by the class certification order. All are in the business of protecting the value of copyrights against copiers whom they do not authorize (core to the claims here), regardless of how they divide proceeds among copyright owners of a given work (mostly collateral). Still, the absence of publisher representatives, or of an author or publisher of some potential subset of works, might be a problem and if so it will surface during the claims and objections process.

So, for the reasons in the class certification order and reinforced since, the clarified class remains certified — and it is likely that final judgment will be appropriate on a classwide basis.

### B.    LIKELY TO GRANT FINAL APPROVAL.

The settlement is within the range likely to be granted final approval upon weighing implied and express factors under Rule 23(e)(2) relevant to this case. *See Briseño v. Henderson*, 998 F.3d 1014, 1022–26 (9th Cir. 2021).

#### *(i)    The* Churchill *Implied Factors.*

Our circuit's long-implied Rule 23(e)(2) factors will likely be found to favor approval. *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575–76 & n.7 (9th Cir. 2004).

Discovery was extensive. This case opened in August 2024. The parties discovered facts through tens of depositions, hundreds of thousands of pages, and terabytes of data. Discovery was set to close and attorney-client privilege issues set to be decided in August 2025. Each side was reasonably well informed of the true universe of facts when they signed the term sheet in August 2025. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992).

Plaintiffs have a strong case on the downloading, but success is not assured were they to go to trial. The district judge ruled that Anthropic's reproductions of named plaintiffs' books specifically in the process of training large language models was a fair use and therefore not a violation of the Copyright Act. And, the judge ruled that Anthropic's one-to-one conversion of purchased print copies for its central library into digital copies for its central library, done for space-saving and searchability, was a fair use. However, the judge also ruled that Anthropic's downloading of millions of books (named plaintiffs' among them) from pirate libraries and assembling them into its own central library was not a fair use, at least not on the summary judgment record. Anthropic had copied many pirated books. It had made further copies of only some for training LLMs, keeping all. Because only Anthropic had moved for summary judgment, all factual disputes and inferences were drawn in plaintiffs' favor at that point. At trial, however, plaintiffs would need to prove all facts before a jury. And, to win greater damages, they'd need to prove Anthropic copied willfully (whereas even if liable Anthropic could still prove it copied while reasonably believing its uses were fair uses, minimizing damages). Thus, a victory for plaintiffs could vary from $150,000 per work down to $200 per work. 17 U.S.C. § 504(c). Any jury award that grossly exceeded the evidence could be

4

truncated after trial. And, a loss would result in no recourse, if there was no copying or only fair use. All the district court's rulings and verdict could get appealed.

On the way to reaching any such resolution through trial, there is almost no risk that the main issues would subvert class certification but there is some risk that challenges to ownership of the right to reproduce the works could crop up and lead to decertification. That risk still inheres in the proposed settlement. If this arises, it will arise in the claims process. It is the judgment of the district judge that these issues will not likely subvert certification.

The settlement thus provides value in prompt closure. It avoids a prolonged, complex, and expensive trial — and all ensuing appeals. To the extent the settlement itself takes time to play out, it provides for interest on the recovery.

Both sides are represented by excellent counsel, and it is their judgment that the result reached is fair, adequate, and reasonable.

On our record, the undersigned so far agrees because of the tailored release, injunctive relief, and per-work award. This case concerned AI inputs, not AI outputs. Under the settlement, class members will give up all claims they could have brought against Anthropic broadly related to *past* AI *inputs*, namely pirating and copying their works in the past up to the point of any AI output. But they do not give up claims about *past* AI *outputs*, nor claims of *any* kind about *future* conduct (on or after August 25, 2025). They get in return an injunction that Anthropic destroy copies of their works derived from LibGen and PiLiMi (so long as not subject to legal preservation requirements). They also get a per-work award of about $3,000, less costs and fees.[2] That is four times the statutory minimum for ordinary infringement, which is also the most common award in copyright cases, of $750.[3] And, that amount is fifteen times the statutory minimum for innocent infringement of $200. 17 U.S.C. § 504(c)(1)–(2). Finally, the per-work amount is an order of magnitude more than the maximum proposed for

---

[2] Because 482,460 works were finally identified, not 500,000, the total per work is about $3,100.
[3] This according to a study cited by counsel at oral argument. The study is limited to cases where plaintiffs won awards on the merits but is not limited to class actions. Benjamin K. Brady, Roy Germano, & Christopher Jon Sprigman, *Statutory Damages Under the Copyright Act: An Empirical Study*, 2022 MICH. ST. L. REV. 1179, 1181 (2023).

5

books in the *Google Books* settlement that was rejected for releasing future claims. *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 672 (S.D.N.Y. 2011) (Judge Oymin Chin). Achieving this per-work amount across nearly a half-million works at once makes this the largest copyright class action settlement in history.

It is premature to assess class members' reactions. All will receive notice and opportunity to be heard. (Federal and state regulators have received notice and have not gotten involved so far.) All objections will be considered by the district judge before final approval.

### *(ii)* The In re Bluetooth *Indicia of Collusion.*

The settlement agreement was negotiated at arm's length and will likely be found to lack collusion. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011); *Briseño*, 998 F.3d at 1022–26.

Defendant will not get money back, unless the settlement blows up, in which case the release also will blow up.

Class counsel will not get an unfair share. The agreement caps any request at 25 percent (before costs and expenses). Similarly, the settlement caps any service fee for named representatives. No fees will be paid without the judge's approval.

Nor will counsel get paid apart from or before the class. The settlement provides that fees be paid from the settlement fund, not from somewhere else. And, at our first hearing, plaintiffs' counsel committed to getting its award not in step with monies paid into the fund, but in step with monies paid out of it to class members.

Finally, the concern about improper side deals has been satisfactorily addressed at this stage. The key policy is conveyed in the long-form notice, which counsel shall crop to this: "*You are prohibited from negotiating any 'quid pro quo' with other rightsholders in exchange for re-inclusion. Any demands for payment in exchange for re-inclusion will be reported to the Court.*" And, no split is mandated on the claim form, as below.

### *(iii)* The Rule 23(e)(2) Enumerated Factors.

Finally, Rule 23(e)(2)'s express factors are likely to be met, too, for the same reasons — being that these recently added factors are based on long-implied ones like those just set out.

6

1   Fed. R. Civ. P. 23(e)(2) note; *Briseño*, 998 F.3d at 1022–26; *see, e.g.*, *Drazen v. Pinto*, 106
2   F.4th 1302, 1329–30 (11th Cir. 2024) (per curiam).  One factor was not yet covered, though:
3         The settlement agreement will likely be found to treat every class member equitably.
4   *Each work gets the same award*.  The awards are alike because the evidence has shown that
5   Anthropic pirated works alike (the claim core to this case).  However, *from each work's equal*
6   *amount*, different copyright owners and so class members might get different amounts
7   depending on the number of co-owners and the agreements among them (largely collateral to
8   this case).  Some class members might be the sole copyright owner of a given work, some not.
9   Some might be subject to an existing publishing agreement for a given work that says how to
10  split proceeds, as our class certification order recognized.  For most, existing publishing
11  agreements will likely dictate an even split, so this is proposed as an option for those works.
12  For certain textbook-like works, however, the process for developing the claim form found
13  they do not regularly dictate an even split, so an even split is not offered as a readymade option
14  for them.  No matter the type of work, it is only fair to let any claimant have the chance to
15  show why any split applies, and the claim form so allows for all.  The settlement plan affords
16  notice, claim forms, further notice, and a plan of distribution.  All were designed — and
17  refined — to let class members prove or disprove ownership and allocation.
18               \*      \*      \*
19        For all these reasons and those stated on the record, the district court found that the
20  proposed settlement will likely satisfy Rule 23(e)(2) at final approval.  The district court
21  preliminarily approved the plan of distribution, for reasons stated above where relevant to the
22  settlement proposal, and for reasons stated next where also relevant to the notice plan.
23        **3.**      **BEST PRACTICABLE NOTICE.**
24        Where preliminary approval is met and no class notice has been delivered yet, a "court
25  must direct to class members the best notice that is practicable under the circumstances,
26  including individual notice to all members who can be identified through reasonable effort."
27  Fed. R. Civ. P. 23(c)(2)(B); *see id.* 23(e)(1)(B), 23(c)(2) note.  Notice must be "as one desirous
28

of actually informing the absentee might reasonably adopt." *See Jones v. Flowers*, 547 U.S. 220, 229 (2006) (quoting *Mullane v. Cent. Hanover Bank & Tr.*, 339 U.S. 306, 315 (1950)).

### A.   INDIRECT NOTICE.

Recall our class members are primarily authors and publishers. The indirect notice plan requires placing advertisements in print media salient to them. Plus there is earned media. Over 800 articles, audio stories, and the like, for instance, appeared in a 31-day period around when the parties announced their proposed settlement. The settlement administrator also will place advertisements on social media platforms and across the web that key off class characteristics. Class counsel and the administrator now have explained further the data, assumptions, and methods behind these advertisements. Nearly 100 million ads in total will be impressed upon persons who look like potential class members so that 95% of class members see at least one (not counting the mass and niche press advertisements above). And, a website lets interested persons search the Works List by title, author, publisher, or ISBN/ASIN, then find complete information about the settlement and take next steps. In sum, the indirect notice plan looks reasonably like what one might do to reach an author, publisher, or other person who is a beneficial or legal owner of copyright interests in works at issue even if unidentified.

### B.   DIRECT NOTICE.

#### (i)   Identification.

The approved notice plan, of course, uses reasonable efforts to identify as many class members as possible for individual notice. It first uses the government and commercial registries in which works must appear to be in the class. Because many benefits motivate rightsholders to maintain work registrations, it is reasonable to use them to identify rightsholders — as the Copyright Act anticipates. *See, e.g.*, 17 U.S.C. §§ 410(c), 501(b). The plan goes further. It compiles information from authors' and publishers' groups and from interested parties. The standard commercial means are then used to identify last-known addresses. Already, for over 99% of works at issue, at least one putative class member's contact information is identified. More will be identified before direct notices are delivered.

This will be done through ongoing work with publishers, who would need to identify authors to submit their own claims anyway.

*(ii)    Delivery.*

The plan then uses multiple, appropriate means to direct notice to those identified.

An initial direct notice is sent by First Class letter mail to all those identified through the efforts just described. The envelope is visibly endorsed by the United States District Court as an important class action notice so it stands out from junk mail. Additional direct notices are sent at least by email to notify the person of any opt-outs related to that person's works (i.e., requests for exclusion), then of any opt-backs (i.e., requests for re-inclusion), then of any claims. Thus, as the distribution plan moves forward, the notice plan does not depend merely on one initial notice plus inquiry. *Cf. United States v. Rivera-Valdes*, __ F.4th __, No. 21-30177, 2025 WL 267255, at *10 (9th Cir. Sept. 18, 2025) (en banc).

The plan also provides for what the settlement administrator will do if it becomes known notice has failed. "[T]he approach the [Supreme] Court has taken in notice cases [is] to ask, with respect to a procedure under which telephone calls were placed to owners, [for instance,] what the [notifier] did when no one answered." *Jones*, 547 U.S. at 231. This plan dictates what reasonable steps will be taken if mail is returned to sender — and likewise if email is returned by a hard or soft bounce, or is shown from "read receipts" to have gone unopened (the plan on these points having been clarified by counsel (Joint Answers Q. 20)). And, it dictates what will happen if claim submissions are below expectation, itself circumstantial evidence that actual notice has failed for some larger than expected number of class members. *Roes, 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1046–47 & n.7 (9th Cir. 2019). This process is thus more than "mere gesture" and indeed is notice due under all the circumstances, as we know them reasonably well. *Id.* at 1047 (quoting *Mullane*, 339 U.S. at 315).

*(iii)   Content.*

In the envelope for the initial direct notice will be a bookmark and a long-form notice. The bookmark, or "buck slip," is designed to capture attention, convey major points, and be a reminder of what class members can choose to do by when. This bookmark is complemented

by the booklet-length long-form notice. The latter is navigable with numbered, frequently asked questions and answers. Individually and together, they will contain all information required, as set out below. And, they do so with clarity, concision, and comprehensiveness reasonably suited to the value at stake and the class members before us, chiefly authors and publishers. *See* Fed. R. Civ. P. 23(e)(1)(B), 23(c)(2)(B) & note.

In emails or postcards for additional or later direct notice, short-form notices may be used. Here, less is more. For emails, including a long-form notice could set off spam filtering and never be seen. For postcards or follow-ups, including a long-form notice would be redundant and defeat the unique benefit of a quick, visible reminder of the relevant next step.

As to all notice content, the district court's questions prompted changes. The preliminary approval in our second hearing was contingent on further changes. The district court has reviewed the changes made (*e.g.*, Dkt. No. 432). Importantly, the long-form notice now contains the complete release of claims, clear instructions for how to opt out, and notice of consent to special master for claims disputes. That said, preliminary approval was granted expecting other improvements, which shall be made by counsel.

*First*, changes made in one place shall be made in every place relevant. Class counsel's revisions caught nearly but not all instances stating a "guarantee that you will receive a payment" (Long-Form 2), for instance, or stating that a class member may be "a beneficial owner of a book" registered "within five years of publication," without recent clarifications (*id.* FAQs 5, 8). Such language shall be conformed to the improved standards counsel has used elsewhere. Also, counsel shall ensure no notice discourages class members from contacting the "court regarding this action" full stop (*id.* FAQ 51), when class members appropriately may do so to file an objection or to plan an appearance, for instance.

*Second*, and similarly, changes made to the long-form notice shall be carried over to the short-form notices where relevant. Where the former does not make a "guarantee," again as one example, neither shall the latter. The bookmark and short-form notices also shall each contain each element of the Rule 23(c)(2)(B)(i)–(vii) content succinctly, including the settlement's binding effect if not opted out. That said, if a later short-form reminder notice is

to be sent after a deadline has passed, content related to the passed deadline may be reduced or removed as the focus turns to the relevant next steps and deadlines.

### *(iv)* *Copyright Act Notice and Content.*

The district judge also made approval contingent on notice satisfying the Copyright Act's notice provisions. The judge asked plaintiffs' counsel to look into whether Section 501(b) requires inserting a copy of the complaint into the direct notice. That section states, in part:

> The court may require [an] owner [who institutes an action for infringement of an exclusive right under a copyright] to serve written notice of the action with a copy of the complaint upon any person shown, by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright, and shall require that such notice be served upon any person whose interest is likely to be affected by a decision in the case.

No appellate court has decided what this means. In the view of this district judge, a copy of the complaint need not be attached here. It will be sufficient that the class notice adequately summarizes the amended complaint and states the claims to be released upon settlement unless opted out, which the proposed long-form notice does. It also directs recipients to all documents in the case and the amended complaint in particular, with copies sent on request.

Separately, plaintiffs' counsel now has filed everything needed to effect notice to the Copyright Office under Section 508(a), providing one more form of indirect notice, too.

### C. FURTHER NOTICE UPON ACTIONS AFFECTING SPECIFIC WORKS.

The above process already embodies what someone desirous of informing an absentee about the settlement against Anthropic would adopt. Some rightsholders might not be identified or might not receive actual notice before the deadline to opt out, to make a claim, or so on, despite efforts. All still will have received all the notice due under the circumstances, as we know them reasonably well now. *See* Fed. R. Civ. P. 23(c)(2)(B) (identifying all not required); *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (actual notice not required).

Even so, once a person submits an opt out or a claim for a work, this new submission and its implications do make further efforts possible to identify and inform absentees who may have an interest in the work of next steps respecting that work — and the plan calls for further efforts as to those subsets in each instance. Recall that besides addressing a claim against

11

Anthropic (core to the case), an opt out or a claim form asserts the submitter's interest in the work and may implicate another's interest in the work and prior agreements between them about how to manage the work and how to allocate any awards from it (largely collateral). The notice plan thus takes new steps to keep relevant absentees apprised of new developments respecting the work and its award allocation, if any. These are as robust as reasonable efforts allow.

*If a person asserting ownership of the relevant right opts out a work*, the plan requires the submitter to identify any others who may be owners of the right to reproduce the work to the extent such information is readily available to the submitter (name, contact information, or both). To require more would overburden the person's right to opt out. And, again, the settlement administrator by then will have exhausted reasonable efforts looking in all the regular places and then some. For any newly identified person, however, the settlement administrator will then use standard commercial means to try to find the person's current contact information, if not provided. And, it then will send to all persons so far identified for the work a notice of the work's opt out and steps available respecting the work. It is possible some newly identified persons will be receiving individual direct notice for the first time, and for them this reminder notice also shall include the long-form notice (the same goes anytime a first direct notice is sent), which may be adjusted to reflect any deadline by then passed.

*If a person who opted out a work then seeks to opt it back in*, the plan does not require the submitter to identify others again. Such efforts would be unreasonable — redundant not only upon what the person provided for the opt out, in most cases, but also upon what the person will provide for a claim form, their likely next step. Still, the settlement administrator will send to all so far identified for the work notice of its re-inclusion and next steps.

*Then, if a person submits a claim for a work*, whether as the next step in this sequence or as a person's initial submission to the settlement administrator, the plan requires the submitter to identify any others who may be owners of the right to reproduce the work to the extent such information is readily available to the submitter. This is not simply redundant. Many will be submitting a claim without having submitted an opt out. And, the burden is slight compared to

12

the money sought — with the claim form also containing a place to provide any allocations due each claimant. For all identified here or previously, the settlement administrator will use standard commercial means to obtain any further contact information and then will send notice of the claim submission and the steps available. *One next step the plan provides*: submit a clarifying or competing claim. This additional opportunity is reasonable. The per-work relief due all works in the class likely will be able to be determined and distributed notwithstanding delay as to one work's per-claimant calculation (with its per-work award held in escrow). That said, not every person identified as having an interest in a work and notified about another's claim form will choose to follow up with their own claim form, for the reason stated next.

*Finally*, the plan takes another reasonable measure to protect the interests of absentees. For works where a claim form identifies multiple rightsholders due payment and is approved, the plan requires that checks be sent to all — even if some have not submitted their own claims. (If later not cashed, checks related to a work are redistributed to that work's other owner(s); still later, unclaimed funds on one work are redistributed to other works — none to defendant.)

In sum, the plan provides all the notice due class members even if submissions about some works are never made, as it exhausts reasonable efforts to identify rightsholders while publishing notice broadly. And, recognizing that a submission about a given work can contain new information and implications about that work, the plan makes additional reasonable efforts that become possible as to that work's relevant potential owners. It targets individual notice at each stage using all information reasonably available up to that stage. It provides additional protections for absentee rightsholders. It does all without perpetually repeating every stage or unduly delaying class settlement of the claims involving the works against Anthropic.

\*   \*   \*

For all these reasons, the district court found the notice plan is best practicable and is what someone actually desirous of reaching another would do under all the circumstances, which we know reasonably well now. Again, the distribution plan also was preliminarily approved. The scheduled dates set forth in the plan were approved.

### 4. APPOINTMENTS.

Class representatives remain Andrea Bartz, Inc., Charles Graeber, and MJ + KJ Inc.

JND Legal Administration is the settlement administrator, appointed at our hearing also to establish a court-approved qualified settlement fund under Treasury Regulation Section 1.468B-1 and to comply with all requirements respecting it. Counsel recommended JND Legal after reviewing competing bids from four firms (Dkt. No. 362 at 15 (citing Dkt. No. 318 ¶¶ 3–4)). And, the district court appointed JND Legal after reviewing these attestations and JND Legal's past performance. Finally, appointment was made after plaintiffs' counsel reiterated its commitment to bear all of the administrator's costs if settlement fails.

Similarly, Attorney Naomi Jane Gray shall be appointed special master for settlement claims provided that Attorney Gray submits a satisfactory declaration setting forth her qualifications and the absence of any conflict, and that the parties submit a stipulated order of reference consistent with the settlement agreement, plan of distribution, and the district court's direction that by consent claim disputes be resolved by special master.

Class counsel remains Lieff Cabraser Heimann & Bernstein, LLP and Susman Godfrey LLP.

### CONCLUSION

For these and the other reasons explained from the bench, the district judge granted preliminary approval and directed notice. The parties and all appointed to roles in this process must carry out the settlement agreement and the plan for notice and distribution, including those parts clarified and revised in answer to the district court's questions and in the supplemental filings before and after our second hearing. Our fairness hearing is set for **NOON ON APRIL 23, 2026**. Any material snafu in implementing the plan must be brought promptly to the attention of the district judge.

**IT IS SO ORDERED.**

Dated: October 17, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE